STATE OF MINNESOTA *ex rel.* SILAS BRALEY AND SILAS BRALEY *vs.* JOHN F. GAY.

Argued Oct. 12, 1894. Affirmed Oct. 30, 1894.

No. 9017

**Elections—Initials of Judges upon the ballots.**

*Held,* where it clearly appears that there was no willful disregard of that part of Laws 1891, ch. 4, § 51, providing that the initials of the judges of election to be placed on the backs of the ballots shall be those of two judges of "opposite political parties," and no wrong or fraud has been intended or perpetrated, that the requirement is not mandatory, but is complied with if the initials are of two judges of the same political affiliation.

**Oath of illiterate or physically disabled elector to obtain aid in marking his ballot.**

The requirement found in section 57 of the same chapter, that an oath must be administered to an alleged illiterate or physically disabled elector before he can have the aid of another person in the marking of his ballot, *held* mandatory. And the elector who requests such aid must, under oath, bring himself strictly within the terms of the statute as to his in-

ability to mark his own ballot. He cannot avail himself of aid upon the ground that he usually uses glasses, but has not brought them with him.

## Form of such oath.

An oath, in its broadest sense, includes all form of attestation by which a party signifies that he is bound in conscience to perform an act faithfully and truthfully. *Held*, in the absence of a statutory form of the oath to be administered to an alleged illiterate or physically disabled elector, that the form used by the judge at the election in controversy was of binding force and effect.

## Elector marking more than three ballots for illiterate or disabled voters.

*Held* (in a case where all—electors, as well as the marker, who was one of the judges of election—acted in good faith), in the absence of a finding that any of the electors whose ballots were marked by the judge at their request, and as they directed, had knowledge that said judge had previously marked more ballots than he was permitted by the terms of said section 57 to mark, namely, three, that the prohibition as to the marking is simply directory.

## Irregularities insufficient to reject ballots.

*Held*, on the facts in this case, that the law requiring and providing for the secrecy of the ballot was not violated. The irregularity complained of was insufficient to warrant the rejection of the ballots cast under such circumstances.

Appeal by plaintiffs, the State of Minnesota and Silas Braley, from a judgment of the District Court of Winona County, *M. J. Severance* and *Charles M. Start*, JJ., entered June 28, 1894, in favor of the defendant, John F. Gay.

At the general election held November 8, 1892, under Laws 1891, ch. 4, plaintiff Silas Braley was the republican candidate for sheriff of Winona County and defendant John F. Gay was the democratic candidate. The county canvassing board upon the returns made to the county auditor found and certified that Gay received 3,293 votes and Braley 3,236. A certificate of election was issued to Gay and he on the first Monday in January, 1893, qualified and entered upon the discharge of the duties of that office. Braley made relation to the Attorney General claiming the office. That officer on January 6, 1893, commenced this action under 1878 G. S. ch. 79, in the name of the state, joining Braley also as plaintiff, and setting forth irregularities and defects in the manner of conducting the election and praying judgment that Gay be ousted and Braley installed, and for

costs.  Defendant answered and the issues were tried before two Judges of that court, one a democrat and the other a republican. Findings were made and filed March 21, 1894, directing judgment for defendant.  The findings stated that in the third precinct of the fourth ward of the City of Winona, Gay received 305 votes and Braley 100.  Others received seven votes.  That not exceeding thirty of the ballots cast in that precinct were indorsed with the initials of two election judges of opposite political parties.  The others were indorsed with the initials of the two democratic judges, but no objection was made thereto at the time.  The election judges did not in fact know until after the election was over that ballots should be indorsed by judges of opposite political parties.  One of the democratic judges in that precinct marked in good faith at least one hundred and fifty ballots for electors who could not read English or had not brought their spectacles.  At least one hundred and twenty five of these ballots were cast for Gay.  Each of these electors was first handed a ballot and if he said he could not mark upon it against the name of the candidate for whom he desired to vote he was asked why he could not.  If he replied that he could not read English or that he had not brought his glasses he was required to take off his hat and raise his right hand, when one of the judges would say to him, "You swear now to this, that what you have told me is true."  Other than this the voter was not sworn.  The ballot was then marked for the voter upon the judges' table as he desired, but in the presence of all three of the judges and of the clerks and other voters present casting their ballots.

The findings further stated that the irregularities and departures from the requirements of the statute were not made with any fraudulent purpose to swell the vote for defendant, or to affect the result of the election.  That the election was free and fair.  That the result as canvassed and returned, correctly expressed the intention and purpose of the electors of the precinct.  As conclusion of law the court found that Gay was duly elected sheriff and entitled to hold the office.  In a note attached to the findings the Judges said:

"One line of judicial decisions holds that any reasonable regulations of the statute as to the conduct of the voter himself are mandatory, and his vote may be refused, if he fails to comply with them.  But

if he comply with the law his right to vote cannot be defeated by reason of irregularities, ignorance, inadvertence or mistake, or even intentional wrong on the part of the election officers. That all provisions of election laws regulating the conduct of an election, except in cases of actual fraud, are directory, that is, a compliance therewith is not essential to a valid election, but compliance with the law by the election officers is to be secured by punishing them, and not by defeating the will of the citizen as expressed by his ballot.

Another line of decisions declares that while the right of the citizen to vote should not be embarrassed by useless formalities, yet it is for the Legislature and not the courts to say what formalities in the conduct of elections are necessary to be observed by election officers in order to insure the purity of the ballot box, and that the courts have no right to virtually override the express will of the Legislature, and hold that so far as the validity of the election is involved, it is a matter of indifference whether the law is complied with or not, and that the only way to secure compliance with election laws is to make the validity of the election depend upon such compliance. The decision of the case at bar turns on the question which of these lines of decision shall be followed.

The rule first stated has been the settled policy of our state for the past thirty years. *Taylor* v. *Taylor*, 10 Minn. 107; *Edson* v. *Childs*, 18 Minn. 64 and 351; *Soper* v. *County of Sibley*, 46 Minn. 274; *Stemper* v. *Higgins*, 38 Minn. 222.

Has the election law of 1891 made, by express declaration or necessary implication, a compliance with its provisions in the respects which we have found it to have been violated, essential to the validity of the election? There is but one of the violated provisions which can be fairly claimed to be mandatory, viz. the failure to have the ballots marked with the initials of two of the judges of election of opposite political parties, as provided by § 51. It is urged by plaintiffs' counsel with much force, that the judges here referred to are the two judges of opposite political parties who are required to place their initials on the ballots by § 51, and the ballots, not being so marked by two such judges, could not be legally placed in the box, and if they were, they were still illegal and could not be counted. We have been much impressed by the verbal logic of this position and admit the question to be one of doubt. But if such is the

law it will result, in practice, in great injustice by enabling election officers through their neglect or positive wrong to disfranchise whole election precincts, and for this reason any doubts we may have in the premises ought to be, and have been resolved in favor of the defendant, who has a *prima facie* right to the office, under his certificate of election.

The two judges mentioned in § 56 are not necessarily judges of opposite political parties.    It is quite clear that the difference in the language used in §§ 51 and 56 is not accidental, and that the words "two judges" in § 56 were intended to and do mean just what they say, and not two judges of opposite political parties, for if this be not so, it would be impossible in many precincts to hold an election.    The provisions of §§ 51 and 56 are applicable to all election precincts, to townships as well as to cities, but in the townships the supervisors are *ex officio* the judges of election, and may be and frequently are all of the same political party, and in such cases if no ballots could be placed in the box unless they had the initials of two judges of opposite political parties indorsed thereon, there of course could be no election.

Any construction leading to such results should be rejected, if possible, and if it cannot be done the law must fail, for any law the practical operation of which would be to thus disfranchise whole townships would be unconstitutional.    This result is avoided and the consistency of the law preserved by holding that the words "two judges" in § 56 mean two judges not necessarily of opposite political parties.    If a person deceives the appointing power, as to his politics, or if a mistake is made in the premises and he is appointed and serves as a judge of election whereby the whole election board is of the same political party and the fact is not discovered until the ballots are cast, shall the election be declared void?    Again, § 7 provides that when a judge for any reason neglects to serve, the electors present may elect another in his place of the same politics as the absent judge.    But suppose they make a mistake as to his politics shall the election be held void?

Judgment was entered accordingly and plaintiffs appeal.    No case or bill of exceptions was made.    The argument here was upon the facts admitted in the pleadings or stated by the trial court in its findings.

*H. W. Childs,* Attorney General, *M. B. Webber* and *O. B. Gould,* for appellants.

The disregard of the provisions of the law and the manner in which the election was conducted in the third precinct destroyed the integrity of the election in that precinct. It not only might, but did, affect the result. Ballots illegally cast in said precinct changed the result of the canvass and must be rejected. All statutory provisions for the conduct of elections are either directory or mandatory, and the violation of a mandatory provision will avoid the election without regard to the motive for its violation, or the effect of such violation upon the result. *People* v. *Board of Canvassers,* 129 N. Y. 395; *Attorney General ex rel.* v. *McQuade,* 94 Mich. 439; McCrary, Elections, §§ 190–194; Brightly, Election Cases, 455, 456; *Barnes* v. *Supervisors,* 51 Miss. 305.

Lord Mansfield's rule is the correct one, that whether the statute is mandatory or not depends upon whether the thing directed to be done was of the essence of that required. *Rex* v. *Loxdale,* 1 Burr. 44.

The requirements for the conduct of election officers, unless the contrary appears, are generally held to be directory, but a requirement to be performed by the voter is mandatory. McCrary, Elections, § 503; *Kirk* v. *Rhoads,* 46 Cal. 398.

Though the court may regard some of the provisions violated as directory only, yet the violations of those provisions were so numerous and of such a character as to cast discredit on the poll. In the administration of election laws individual instances will occur when the voter will lose his ballot, but this is no greater hardship than will sometimes befall the citizen in the administration of the laws in general. By holding that a violation of the law does not affect an election we in effect nullify the statute and say to election officers it is not necessary to follow its commands. *State* v. *Cook,* 41 Mo. 593; *Rhodes* v. *Smethurst,* 4 Mees. & W. 63; *Smith* v. *Rhines,* 2 Sumn. 354; *West* v. *Ross,* 53 Mo. 350; *Talcott* v. *Philbrick,* 59 Conn. 472; *Fields* v. *Osborne,* 60 Conn. 544.

Whether there was or was not a fraudulent intent on the part of the election officers or others to defeat the will of the voters and whether or not the electors voted for the candidates of their choice

are not here so much the questions as whether such electors have made their selection under the forms and in the manner required by the election law. If the limitations and safeguards thrown around the method of voting to prevent dishonest practices have been ignored, no one has a right to complain if the choice so expressed should be disregarded.

The election law provides that when the elector makes oath that he cannot read English or that because of physical disability he cannot mark his ballot, he shall have the right to call to his aid either a judge or a qualified elector. Not one of the one hundred and fifty voters whose ballots were marked by a judge of election made the required oath, or any proper oath at all. *Arnold* v. *Town of Middletown*, 41 Conn. 206; *State* v. *McCarthy*, 41 Minn. 59; *United States* v. *Kennedy*, 3 McLean 175; *Bush* v. *Commonwealth*, 80 Ky. 244; *Wakefield* v. *Ross*, 5 Mason, 16.

Experience has shown that the only adequate guaranty of free and equal elections is secrecy. Where elections are secret, bribery and coercion cease to be practiced, because the objects sought by them can no longer be obtained with any certainty. *Temple* v. *Mead*, 4 Vt. 535; *People ex rel.* v. *Pease*, 27 N. Y. 45; *Council* v. *Rush*, 82 Mich. 532; *State* v. *Black*, 54 N. J. Law, 446.

A law providing for numbering ballots is invalid on the ground that by such means the free exercise of suffrage is violated. *Brisbin* v. *Cleary*, 26 Minn. 107; *Williams* v. *Stein*, 38 Ind. 89.

The marking of ballots in public and the public announcement that the voter desires to vote for a candidate named is an utter disregard of not only the letter, but the very spirit and essence of the law. It is no answer to the violation of the law to point out the inconvenience to the election officers that obedience of the law would occasion, or to show that all the electors in the precinct could not have voted, if the strict provisions of the law had been observed. *State* v. *Black*, 54 N. J. Law 446.

Of the four hundred and twelve ballots cast, not to exceed thirty were indorsed with the initials of two of the judges of opposite political parties. The initials of two judges of the same political party no more complies with the law than the indorsement of one judge, or one judge and one clerk. *Parvin* v. *Winberg*, 130 Ind. 561.

The learned trial Judges felt compelled to their conclusion by the rule laid down in *Taylor* v. *Taylor*, 10 Minn. 107, and followed in *Edson* v. *Child*, 18 Minn. 64; *Stemper* v. *Higgins*, 38 Minn. 222; and *Soper* v. *County of Sibley*, 46 Minn. 274. But we insist that the doctrine established by those cases is not applicable to the questions now being considered. Our state in the matter of elections has entered upon a new departure, and in enacting the Australian ballot system intended to eradicate the evils that had for thirty years attended the elective franchise under the old law.

*L. L. Brown* and *Edward Lees,* for respondent.

To invalidate an election on the ground of intimidation, it must appear that electors were kept from voting or compelled to vote against their will. Mere noise, confusion or threats will not suffice. The intimidation must have effected a change in the result of the election, or by reason of it the true result must have been rendered uncertain and incapable of being ascertained from the returns. McCrary, Elections, 515; *State* v. *Calvert*, 98 N. C. 580.

The provision of the election law prohibiting the congregation of a crowd within one hundred feet of the polls is a police regulation merely and is intended to secure good order at the polls. The failure to observe it has no effect upon the validity of an election. *State* v. *Black*, 54 N. J. Law 446.

The maxim that fraud is not presumed applies to the conduct of elections and making returns. An election return is *prima facie* evidence of the result of an election. This rule is based upon three presumptions; *first,* that sworn officers act honestly and in good faith; *second,* that they perform their duties with care; *third,* that the votes received by them are legal votes. To rebut the first presumption, it must be shown that the duties of the officers were so carelessly performed that there were opportunities for others to commit frauds, and that they probably were committed; or that the officers themselves were parties to fraud in which case the value of the return as evidence is wholly destroyed. The second presumption may be rebutted by evidence that the officers acted with a gross disregard of the statutory provisions in receiving votes and that the result of the election was thereby affected. The third presumption

may be rebutted by showing such a total disregard of the statutory requirements in the reception of votes as to warrant a conclusion of fraud.

The claim that fraud has been established cannot be sustained. It is easy to weave suspicions out of trifling circumstances when the mind is predisposed to suspect.   Wrong constructions may be and frequently are placed upon conduct which is actuated only by the purest of motives.   In the heat of partisan conflict men too often forget to be just, and attribute defeat only too willingly to fraud and intimidation on the part of their opponents.   In a memorandum attached to the findings, the court states that after weighing the evidence it is satisfied that the election was substantially a fair one and that the plaintiffs have failed to prove their claim of fraud and intimidation.

The right of suffrage is not a natural right, nor is it an absolute unqualified personal right.   It is derived from the constitution and statutes and its regulation is within the power of the legislature. McCrary, Elections, 11.   The legislature can make reasonable rules for the conduct of elections and prescribe the manner in which the elective franchise shall be exercised, and the only limitation upon its power to regulate is, that the right to vote must not thereby be destroyed or substantially impaired.   McCrary, Elections, 91, 94; *Common Council* v. *Rush*, 82 Mich. 532.

Questions affecting the purity of elections are in this country of vital importance.   Upon them hangs the experiment of selfgovernment.   The objects are first to secure to the voter a free, untrammelled vote; and secondly, a correct record and return of the vote. It is mainly with reference to these two objects that the rules for conducting elections are prescribed.   But these rules are only the means.   The end is the freedom and purity of the election.   To hold these rules mandatory and essential to the validity of the election is to subordinate substance to form, the end to the means. *Gilleland* v. *Schuyler*, 9 Kans. 569.

Courts have built upon this foundation a series of rules applicable in the consideration of the case at bar.   The first and most important of these rules is, that the provisions of an act for the regulation of elections and prescribing the manner in which they shall be conducted may be divided into two classes; those which are manda-

tory, and those which are merely directory. A failure to comply with provisions of the first class invalidates the election, while failure to observe those of the second class does not. *Parvin* v. *Wimberg*, 130 Ind. 561.

Provisions of the statute which affect the time and place of election and the legal qualification of electors, are mandatory; while those touching the recording and return of the votes received and the mode and manner of conducting the election, are directory. In other words, irregularities which do not tend to affect results are not to defeat the will of the majority. *Taylor* v. *Taylor*, 10 Minn. 107; *Edson* v. *Child*, 18 Minn. 64; *Stemper* v. *Higgins*, 38 Minn. 222; *Soper* v. *County of Sibley*, 46 Minn. 274; *Farrington* v. *Turner*, 53 Mich. 27; *State ex rel.* v. *Nicholson*, 102 N. C. 465; *State ex rel.* v. *Russell*, 34 Neb. 116; *Bowers* v. *Smith*, 111 Mo. 45; *State* v. *Saxon*, 30 Fla. 668.

Another of these general rules is, that the burden of proof is upon the person asking that an election be set aside for irregularities occurring in conducting it. He must show that they were in disregard of mandatory provisions of the law, or were such as affected the result. *Taylor* v. *Taylor*, 10 Minn. 107; *Stemper* v. *Higgins*, 38 Minn. 222.

Where no educational qualification is attached by the constitution to the grant of the franchise any act of the Legislature which practically operates to deprive persons unable to read, of a free choice of those for whom they desire to vote, is unconstitutional. *Rogers* v. *Jacob*, 88 Ky. 502; *Common Council* v. *Rush*, 82 Mich. 532.

The fact that the marking of an illiterate's ballot by an election officer gives it publicity is no objection, for the elector's party preference is ordinarily shown by his choice of the officer to assist him. If an elector has his ballot marked by a person who has already marked for three others, shall this fact of itself invalidate the ballot? It is not provided that the election officers shall refuse to receive the ballot for that reason, nor that if such a ballot be received and deposited in the ballot box, that it shall not be counted upon the canvass of the votes. If the Legislature intended that all ballots of illiterate voters in excess of three marked for them by the same person should be invalid, why is it that the law fails to so provide?

The election law of 1889 provided that no person should mark the ballots of more than six electors. This provision was incorporated bodily into the law of 1891, the only change being from six to three. The law of 1889 contained no provision for the marking of illiterates' ballots by judges of election at all. By the law of 1891 that feature was first introduced and the provision of the law of 1889 was apparently retained without any thought as to the bearing it might have on the right of election officers to mark ballots. In 1893, the election law was again revised and harmonized and a distinction is made between election officers as a class and unofficial persons in marking ballots for illiterate electors. The provision of the law of 1889 is still retained in substantially the same form as when first enacted, but it is confined in its operation to unofficial persons. Counsel for respondent therefore contend that the provisions of Laws 1891, ch. 4, § 57, in so far as they relate to the number of ballots which may be marked by any one person for illiterate voters are directory only.

An oath in its broadest sense includes any form of attestation by which a party signifies that he is bound in conscience to perform an act faithfully and truly. Bouvier Law Dict. title "Oath." The more generally accepted doctrine appears to be that the imprecation is no part of the oath, and it is regarded as a mere adjunct of questionable propriety, calculated to divert attention from the true meaning of the ceremony and fix it on some external observance. Best, Prin. of Ev. 43. The propriety of the imprecatory clause in an oath is disputed by Bentham who says that the supposition of its efficacy is absurd in principle. *State* v. *Madigan,* 57 Minn. 425.

Under the law of 1891, the proper place to mark ballots for illiterate voters is on the table at which the election officers sit. That law, § 46, provides that the judges of election and the ballot boxes shall at all times be in public view. The judges are responsible for the safe keeping of the ballot boxes, poll lists and registers. It would be improper for them to leave these in the custody of one of their number, while the other two accompanied the voter to a booth to prepare his ballot for him there, for it must be prepared in presence of two judges. Laws 1891, ch. 4, § 53, provided that if any elector after marking his ballot shows it to any one except as hereinafter provided the judges of election shall not receive it. The

exception in this section is evidently a reference to § 57. While secrecy is of prime importance in all elections by ballot, it is evident that absolute secrecy cannot be attained without disfranchising a large class of voters; the most that can be required is the avoidance of all unnecessary publicity, and the preservation of such a degree of secrecy as is consistent with the expression of his choice by the illiterate voter. Such is the law now in force in this state. Laws 1893, ch. 4, § 103.

The statute provides that two judges of opposite political parties shall place their initials on the back of the ballots, § 51, and that no ballot which has not the initials of two judges of election, in said judges' own handwriting on the back thereof, shall be placed in the box, § 56. This provision is not mandatory and does not come under the first of the three general rules above stated. The failure to observe it does not vitiate the election. The trial judges have stated adequate reasons for this conclusion and we cannot improve upon them. The evident purpose of the provision is to prevent the counting of fraudulent votes by indorsing upon all legal ballots an identifying mark by which they may be known, both when placed in and when taken from the ballot boxes. This purpose is accomplished as well by the indorsement of two judges of the same political party, as it is by that of two judges of opposing parties. If the indorsement is so made that the election officers are enabled to identify each ballot as genuine there is a sufficient compliance with the legislative purpose. Under the provision of the election law of Indiana, considered in *Parvin* v. *Wimberg,* 130 Ind. 561, any ballot not properly indorsed was by the express terms of the act not to be counted. The law of Minnesota contains no such provision. Under Laws 1891, ch. 4, § 67, if more ballots are found in the box than the poll lists show were cast, and a portion of the ballots are not properly indorsed, such ballots shall be laid aside. If there is still an excess they shall be replaced in the box and one of the judges shall then withdraw a number of ballots equal to the excess and these shall be laid aside and not counted. Now, if it had been the intention to invalidate all ballots not indorsed as required by § 51, that portion of § 67 above quoted would not appear in the act. Its enactment is equivalent to a statement that § 51 is directory merely.

There is no universal rule by which directory may be distinguished

v.59 m.—2

from mandatory provisions in a statute.   The subject matter of the provision must be looked to, its importance must be considered and the relation of the particular provision to the general object intended to be secured by the act must be kept in mind and the question reviewed and decided from these different aspects.   *Bowen* v. *City of Minneapolis*, 47 Minn. 115.   The practical effect of any given construction of a statute will also be considered in getting at its true intent and meaning.   If the result of the construction sought to be placed upon it leads to injustice or renders invalid the act itself, it may generally be said that there is fault in the construction and that such an end was never intended or suspected by the framers of the act.   *People ex rel.* v. *Board of Canvassers*, 129 N. Y. 395; *Bowers* v. *Smith*, 111 Mo. 45; *Taylor* v. *Taylor*, 10 Minn. 107.

*People ex rel.* v. *Board of Canvassers*, 129 N. Y. 395, largely relied upon by appellants is of doubtful authority.   It has been greatly and justly criticized.   Decided as it was by a divided court and to some extent at least upon party lines, its value as an authority is greatly lessened.   The dissenting opinion of Judge Peckham has received far more general approval than that of the majority of the court.   *State* v. *Russell*, 34 Neb. 116; *Bowers* v. *Smith*, 111 Mo. 45.

Appellants rely upon irregularities to defeat the will of between four and five hundred qualified electors which was honestly and fairly expressed.   Courts have been slow to set aside an election on the ground of irregularity in its conduct.   It is the part of wisdom to seek by all fair and reasonable means to uphold rather than to annul a popular election.

If all electors were familiar with the wilderness of rules for their guidance which the law provides it might be proper to adhere to the letter of the law and punish a departure from it by disfranchisement. In its anxiety to protect the honest voters from the "boss" of the district, and to cut off all possible interference from this malign genius of American politics, the Legislature has surrounded the ballot box with a strong guard of penal provisions and has made the avenue of approach to it by the uninformed voter a matter of much perplexity and difficulty.   There is an almost painful minuteness and precision about the average Australian ballot law.   The end it has sought to reach is high and worthy of all possible encouragement.   It is the purification of politics and the promotion of inde-

pendence in the exercise of the elective franchise. The law has worked well in practice and has met with general popular approval. If it is to continue to hold its place in the good will of the people, and is to finally accomplish the end that the true reformer of the ballot system has in mind, no narrow or technical construction of its provisions ought to be tolerated. It is not just that the innocent voter should lose his vote through the neglect or wrongdoing of officers or others over whom he has no control, and this we think was never the legislative intention.

COLLINS, J. By this proceeding the relator, Braley, questions the right of defendant, Gay, to the office of sheriff of Winona county. The election under which the latter now holds the office is that of 1892, and consequently the election law involved is Laws 1891, ch. 4. We readily agree with counsel in the assertion that it was the purpose of the Legislature, when enacting this law, to purge our methods of conducting elections of some of the evils connected therewith, and to promote the purity of the ballot; but the law must not be construed so radically as to render it incapable of enforcement without disfranchising great numbers of electors through no fault of their own, nor must the construction placed upon it be so technical as to lead to its overthrow. The construction must be practical, if this be possible, in view of the language used.

1. At one of the precincts in the city of Winona, two of the judges of election were of the same political party, while the third was of another party. Chapter 4, § 51, requires that two of the judges, "of opposite political parties," shall place their initials on the backs of all the ballots before they are used by the voters. No subsequent reference is made in the law to this requirement that the judges who thus mark the ballots shall be of opposite political faith; but by later sections (52 and 56) it is enacted that the ballot, when presented to the voter, shall have the proper initials to be exposed to the judges when, after marking, it shall be offered for deposit in the box, and "no ballot which has not the initials of two judges of election in said judges' own handwriting on the back thereof" shall be placed in the box. About thirty of the ballots cast at this precinct, out of a total of 412, were marked by two of the

judges of election in accordance with the provisions of said section 51; but the balance bore the initials of two judges who happened to be of the same political persuasion; and, if these ballots can be cast out of the count, relator is entitled to the office. His counsel claim that the provision of the law which requires the two judges who place their initials upon the backs of the ballots to be of opposite political parties is mandatory, and that, unless strictly complied with, the ballots should not be counted. We cannot adopt this view. It is not claimed that there was any willful disregard of this provision of the law, or that by failing to observe it a fraud was perpetrated upon any one, or that a wrong was intended or accomplished. The placing of initials on the ballots by judges who belonged to the same party was in ignorance of the requirement in question. There are many reasons why this provision must be held simply directory, but we need not state all. One is that if this is a positive requirement the entire vote of a precinct could be rejected by deception on the part of a person seeking the position of judge of election, as to his politics, or by a mistake on the part of the appointing power as to the political affiliations of a person placed by it on the board, and in many other ways. Again, what would be the result if no persons could be found to serve as judges of election, except those of the same political party? With the construction contended for the minority party in any precinct could disfranchise every voter in it, and the fewer in numbers of such party the easier total disfranchisement could be accomplished. Again, we think the omission in section 56 of all reference to political affiliations is significant, if not controlling. When providing that ballots shall not be deposited in the box not bearing the initials of two judges, nothing is said as to the necessity of such initials being those of the judges of opposite political parties.

2. By section 57 it is required that whenever an elector shall make oath that, for specified reasons, he cannot mark his ballot, he may have the aid of a judge of election or qualified elector, who may read it to and mark it for him. The court below found that at the election in question, and at the precinct before mentioned, one of the judges of election marked at least 150 ballots for alleged illiterate and physically disabled voters, of which at least 125

were cast and counted for the defendant. This was done in good faith, in the presence of the other judges, of the clerks of election, and of some other electors. These ballots were all marked as requested by the voters whose requests were being complied with. Previous to marking, the voter who desired aid in the preparation of his ballot was asked by one of the judges the reason, and "if he replied that he could not read English, or had left his glasses at home," he was required to raise his right hand, whereupon the judge said to him these words: "You swear now to this; that what you have told me is true."

The statutes nowhere prescribe the form of the oath to be administered to alleged illiterate or physically disabled voters, while the only general provision in respect to oaths is that found in 1878 G. S. ch. 72, § 7. By this section it is enacted that the usual mode of administering oaths "now practiced in this state," with the ceremony of holding up the right hand, shall be observed. An oath, in its broadest sense, includes any form of attestation by which a party signifies that he is bound in conscience to perform an act faithfully and truthfully. 2 Bouv. Law Dict. 320.

While the form used at the election was not as formal and exact as it might have been, we are of the opinion that it was of binding force and effect upon the conscience of the persons to whom it was administered. It was sufficient upon which to base the charge of perjury. See State v. Madigan, 57 Minn. 425, (59 N. W. 490.) We also wish to say in this connection that the provision of the law requiring the administration of an oath to such voters as claim the right to have their ballots marked by another person is mandatory, and must be strictly observed. An oath binding in form must be administered.

3. As before stated, the court below found that one of the judges of election marked, at the request of electors, 150 of the ballots. It is urged by counsel for relator that the language used in said section 57, that no one person shall so mark the ballots of more than three electors, is mandatory, and hence that 147 of these ballots were illegally cast, and must be excluded from the count. We are of the opinion that in the absence of a finding that a single one of the voters whose ballots were marked by the same judge, subsequent to the first three, had knowledge of the fact that he had previously per-

formed the same service for three or more electors, the language cannot be held mandatory. Had there been a finding that this disregard of the terms of section 57 was with the knowledge and consent of the illiterate or physically disabled electors, we are quite clear that as to all who participated in this violation of the provision of the law, we should be obliged to hold it mandatory. Of course, we are now speaking, when holding that the words are simply directory, of a case where all—markers as well as electors—have acted in good faith. It is true that from the findings as to the size of the room in which the election was held, the location of the table on which the marking was done, and the position of the electors as they came forward to vote, it might be inferred that some of them must have known what was being done. But we cannot act on mere inference, and declare that they did. In this connection we wish to say that, in order to have a ballot marked by another person, the alleged illiterate or physically disabled elector must bring himself within the meaning of those terms. The fact that he is obliged to wear glasses, and has left them at home, as was the case with some of those for whom ballots were marked, is not sufficient. If the court below had found how many of these there were whose ballots were received, or the number thereof voting for defendant, we should feel constrained to deduct that number from defendant's plurality. But it failed so to do.

4. It has been said that this marking was done upon the table around which sat the judges and clerks, and in the presence of other electors, who were passing in and out of the voting booths in the rear of the room, and of others who were waiting an opportunity to cast their ballots. It is urged that because of this irregularity, whereby the absolute secrecy of the ballot was removed, all of the ballots marked so publicly should be rejected. A fair interpretation of the law requires the preservation, as far as possible, of secrecy as to the manner in which an elector votes. But impossibilities cannot be required. It is a commendable provision which authorizes the judges of election to mark the ballots of such voters as are unable, within the terms of the law, to mark their own, and yet if the judges do this it cannot be done privately. A judge would not be permitted to seclude himself with the elector, either by clearing the room or by withdrawing from it. Nor could the voter's wishes be

communicated, ordinarily, in so low a tone of voice as to prevent others from learning how he intended to vote. To demand anything approaching absolute secrecy in such cases would be wholly impracticable. We desire to protect the constitutional secrecy of the ballot fully, but it is impossible to insist upon the secrecy contended for by counsel for relator, where the right of suffrage is conferred upon the illiterate and physically disabled, as in this state, and is to be exercised in accordance with what is known as the "Australian System." While it is evident that others had the opportunity, if so disposed, to hear what was said by many of the electors to the judge as to the way in which they wished to have their ballots marked, it appears to us that there was a total absence of a design that they should be heard. Undoubtedly, intimidation was not tolerated, and the views and preferences of the voters were fairly expressed by their ballots. The irregularity is insufficient to warrant us in excluding these ballots.

5. What we have said covers all of the assignments of error which need special consideration. We are satisfied that the relator has not established the allegations of his complaint, and as a result the judgment stands affirmed.

(Opinion published 60 N. W. 676.)