WELLINGTON PENNINGTON v. ROBERT N. HARE.[1]

January 29, 1895.

No. 9272.

### Elections—Erroneous Exclusion of Voters.

Where qualified electors offered to vote, but were prevented from actually casting their ballots by an erroneous decision of the election judges, held, that such ballots cannot be counted for the candidate the electors subsequently declared they intended to have voted for if they had voted.

### Numbering Ballots.

Laws 1893, c. 4, §§ 89, 105, and subsection 7 of section 136 (G. S. 1894, §§ 94, 110, 141, subsec. 7), construed. Held, that where the judges of election, by reason of a mistake as to the law, numbered the ballots of electors, without their knowledge, the ballots so numbered are legal, and must be counted as cast.

### Voter's Name on Ballot.

Held that, where electors intentionally write their names upon their ballots, for identification, and so cast them, such ballots cannot be counted for either party.

### Cross Marks.

Held, that the proviso of subsection 7 is mandatory, but that any mark which it is apparent was honestly intended for a cross mark, and for noth-

1 Reported in 62 N. W. 116.

ing else, must be given effect as such, no matter how crude in form it may be.

Appeal by Wellington Pennington from a judgment of the district court for Ramsey county, Willis, J., that Robert N. Hare was elected to the office of alderman from the Sixth ward of the city of St. Paul. Affirmed.

*W. H. Lightner, F. W. Zollman, Henry Johns, F. C. Stevens,* and *P. D. Godfrey,* for appellant.

*J. C. Michael* and *John H. Ives,* for respondent.

START, C. J.   At a city election held in the city of St. Paul on May 1, 1894, under the provisions of Laws 1893, c. 4 (G. S. 1894, §§ 6–205, the parties hereto were rival candidates for the office of alderman of the Sixth ward.   The canvassing board declared the respondent elected, and appellant appealed to the district court of Ramsey county, where the matter was heard, and judgment entered for the respondent, from which the appellant appealed to this court.

1. In the Eighth precinct of the ward, 93 ballots were cast and counted for the appellant, and 42 for the respondent, which had been numbered, without the knowledge of the electors casting them, by the judges of election, by reason of a misunderstanding of the law on their part.   These ballots were properly counted for the respective parties.   To hold otherwise would place it in the power of the election officers to disfranchise electors at their pleasure. State v. Gay, 59 Minn. 6, 60 N. W. 676.   Including these ballots, the respondent received 1,018 undisputed votes, and the appellant 1,013 like votes.   In addition to the undisputed ballots, the district court counted 12 supposed votes for the respondent, which that number of electors, who were prevented from voting at the election by reason of an erroneous ruling of the judges thereof, said they had intended to have cast for him.   There were also 16 actual ballots which were disputed, 12 of them are designated in the record as Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, A, B, and C, and the other four as Exhibits G, H, I, and J.   The four were marked by each elector writing his name on the back of his ballot.

2. The court found as a fact, with reference to the 12 supposed votes, that 12 qualified electors of the Second precinct entered the polling booth with the intention of voting for the respondent, but by

an erroneous decision of the judges they were not permitted to vote; that they were not prevented from voting by fraud or intimidation. If these electors had been prevented from voting by fraud or violence, it might and probably would have been the duty of the court to have rejected the entire vote of the precinct, or declared the election void, as justice might require. It is not necessary to decide this point, for the record presents the simple question, can votes not cast, because of an error of judgment on the part of the election officers, be counted as if cast and returned? We are clearly of the opinion that they cannot be. Where a ballot has been marked by the elector, properly cast, and returned, we have something tangible and certain to deal with, and from it we unerringly read the intention and act of the elector. But where, as in this case, the supposed ballots were never in existence, and we must rely upon the subsequent declarations of the electors as to how they intended to and would have marked and cast their ballots, if they had voted, it would be an uncertain and dangerous experiment to attempt the task of ascertaining and giving effect to their intentions, as ballots actually cast and returned. Uncertain, because it would be simply a matter of speculation; dangerous, because it would give to such electors the power of determining the result of an election, in a close contest. All that it would be necessary for them to do, in such a case, to decide the election, would be to declare that they intended to vote for a particular candidate. It would enable them to sell the office to the candidate offering the highest price for it, because they would not be called upon for their declaration until a contest arose, after the actual ballots had been counted, and the precise effect of their statement known. They could swear falsely as to their past intentions, without fear of punishment, for how would it be possible to disprove their statements as to their intentions with reference to a supposed act, if perchance they had acted? Cooley, Const. Lim. 781. It seems a hardship that an elector should lose his vote by reason of an error of the election judges, but errors of judgment are inevitable; and, whenever any possible remedy which can be suggested is inconsistent with the highest public interests, they are remediless. The proposition that the title to a public office can be made dependent upon the subsequent statements of an elector as to what he would have done, if he had been permitted to vote, is not

only contrary to sound public policy, but seems to be simply unthinkable.

3. Exhibits 1 and 2 were not counted by the district court for either party, for the reason, as the court found, that the name of the appellant was not marked by a cross mark, while other names on the same ballot were so marked. Laws 1893, c. 4, § 136, subsec. 7 (G. S. 1894, § 141, subsec. 7). This section provides that if any elector, marking his ballot, shall use any mark clearly indicating an intent to mark against the name of any candidate, it shall be a sufficient vote for the candidate, provided the cross mark is not used elsewhere on the ballot. The evident purpose of the proviso is to prevent the elector from placing upon his ballot any distinguishing mark, whereby it may be certified to others how he voted. A ballot so marked cannot be counted; otherwise, a corrupt candidate might, by previous agreement, arrange with his purchased creatures to place a particular mark after his name, whereby he could ascertain, when the ballots were canvassed, that they had kept faith with him, and were entitled to the purchase price of their honor. The statute does not, however, prescribe any inflexible rule as to what shall or shall not be accepted as a cross mark, and any mark, however crude and imperfect in form, if it is apparent that it was honestly intended as a cross mark, and for nothing else, must be given effect as such; otherwise, electors unaccustomed to the use of pen or pencil might be disfranchised. An examination of Exhibits 1 and 2 discloses the fact that each of them was marked with a cross, within this rule, and they must be counted for the appellant. Exhibits 3, 7, and 9 were all correctly counted for the appellant by the court. Exhibits 4, 6, and 8 were not counted for either party, and correctly so, for each of them was marked for two candidates for alderman, with no attempt to erase either mark. Exhibit 5 was rejected by the court as a spoiled ballot, which was never actually cast. It had a cross mark opposite the name of the appellant. There is evidence in the record to sustain the finding of the court, and the ballot was properly rejected. Exhibit A was properly counted for the respondent. There was a cross after the name of another candidate for alderman, as well as one after the respondent's name, but there was a clear attempt to erase the former. Exhibits B and C were not counted for either party. The first had a cross mark equally near

to the name of two candidates for alderman, and the second a like mark opposite the names of two such candidates, with no attempt to erase either. The ruling was correct.

4. The district court found that Exhibits G, H, I, and J, three of which were marked and cast for appellant, and one for the respondent, were marked for identification, by each elector writing his name upon the back of his ballot; and it rejected them from the count, as ballots identified, divulged, and shown, contrary to law. This finding of fact is sustained by the evidence. Were these ballots legally rejected? Section 105 of the election law (G. S. 1894, § 110) provides that no voter shall divulge to any one within the polling place the name of any candidate for whom he intends to vote, or has voted. If any elector (except as provided for disabled and illiterate voters), after having marked his ballot, show it to any one, the judges of election shall refuse to receive or place the same in the ballot box; and, if such showing was clearly intentional, no other ballot shall be delivered to such elector. It is to be observed that the prohibitions of this section relate to the personal conduct of the elector. There is a clear distinction between the provisions and prohibitions in election laws which are personal to the elector, which, if he violates them, it is his own fault, and those which apply to elective officers, over whose conduct he has no control. In the former case they are to be construed as mandatory, as a general rule, and his vote will be rejected if he intentionally fails to comply with them, while in the latter case they are to be construed as directory, unless otherwise expressly, or by necessary implication, so declared by statute. This distinction is illustrated by the decision of this court in the case of State v. Gay, where it was held that the provisions of the statute that the elector must make oath to his disability or illiteracy before he can have the assistance of another in marking his ballot was mandatory, but the provision prohibiting the judge of election from marking more than three ballots was held directory, where the electors had no knowledge that the judges had marked more than the limited number.

Clearly, if the electors casting the ballots in question intended to, and did, by writing their names on the backs of their ballots, identify them, they violated the provisions of this section, and their ballots could not have been legally placed in the ballot

box, or, if placed there, could not have been legally counted. If, after marking their ballots with the cross mark, these electors had intentionally opened them, and showed any of the election officers how they had voted, it would have been a clear violation of the statute, and their ballots would have been rejected. The prohibition is not directed against the form and manner of divulging how the elector voted, or how he showed his ballot, after cross-marking it, to any one, but against the act itself. Now these electors, in substance and effect, divulged within the polling place for whom they had voted, and showed their ballots, after marking them, by writing their names upon them for identification. When the votes were canvassed within the polling place, the judges, clerks, and others engaged in or observing the canvass were informed, by the signatures of the electors on their ballots, just how and for whom they had voted; and the divulging and showing, which had their beginning when the electors wrote their names on the ballots, were then completed, and became effectual.

It is urged, as a reason why this view of the statute should not be accepted, that secrecy of the ballot is the personal privilege of the elector, which he may waive. This is true only where considerations of public policy, as declared by the legislature, do not forbid such disclosure. The prohibitions of this statute were intended to prevent the identification of a particular ballot as the one cast by a particular elector, whereby the traffic in votes might be facilitated. They rest upon the same considerations of public policy as the proviso in subsection 7 of section 136 (G. S. 1894, § 141, subsec. 7), already referred to. There could be no more certain and effectual way of identifying the elector's ballot than by his writing his name on the back thereof. The fact that illiterate voters may disclose, to a limited extent, how they voted is no reason why electors who can mark their own ballots should not be prohibited from showing them, under penalty of having them rejected, for in the former case it is a necessity. It is true, as urged by counsel for appellant, that the law has left open many other ways whereby the ballots may be identified; but this furnishes no reason why the court should open, by a construction of the statute, those closed by the legislature. Exhibits G, H, I, and J were properly rejected from the count.

5. From the foregoing conclusions, the result is reached that the

appellant received 1,018 legal votes, and the respondent 1,019 legal votes, and that he was duly elected alderman for the Sixth ward of the city of St. Paul.

Judgment affirmed.

COLLINS, J. (dissenting).    The court below found that four of the ballots, Exhibits G, H, I, and J, had each been marked by the elector who voted the same, with his own name, for identification.    In my judgment, there was no evidence to justify the finding that either of these ballots had been marked for such a purpose,—that is, for the purpose of having it known that the ballots were cast by these particular persons,—and I think the logical result of such a finding is to ascribe a bad motive to the voters.    The only evidence bearing upon the matter was that upon the back of each of these ballots appears a name corresponding with that of a person who voted at the election in question.    By whom written, or when, or that either of these names was in the handwriting of that particular person, was not shown.    None of the judges or clerks of election discovered either of these names when receiving the ballots, or when canvassing the votes.    Nor does it even appear anywhere that the three persons appointed under the statute to re-count the votes discovered these names.    It is the fact, in so far as revealed by the record, that not a single person knew of the names being on the ballots until it was discovered upon the trial in the district court, about three months after the election.

The main opinion is predicated upon the theory that there was a clear violation of section 105 (G. S. 1894, § 110), which provides that no voter shall divulge to any one within the polling place the name of a candidate for whom he intends to vote or has voted, and also provides that if any elector, after having marked his ballot, shows it to any one, except as elsewhere provided, the judge of election shall refuse it, and place it among the spoiled ballots, and, if such showing was clearly intentional, shall not deliver another ballot to the elector. How, under any of the definitions of the word "divulge," or any fair construction of the expression "within the polling place," the voter could divulge, within the place specified, for whom he intended to vote or had voted, without announcing the fact so that it would be known in the room in which the election was held by one or more persons,

I cannot understand. If the voter does nothing which at the time, and within the place, actually informs the public, or at least one person, what he has done or proposes to do, he has not "divulged" anything. Nor can I understand how one person can divulge an intention to do a certain thing, or that he has done it, unless the intent or the fact is brought to the knowledge of another person. Nor can I understand how, unless we disregard all definitions of the word, an elector can "show" his ballot without exhibiting or bringing it to public view. Within the meaning of the law, an elector does not "show" his ballot by the doing of an act through which it becomes a possibility that at some future time it may be known for whom he voted. To me the legislative intent in using the word "show" seems plain, from the fact that the statute provides what shall be done if the ballot is shown,—a present, actual showing at the polls, only, being contemplated or provided for.

Again, if either of the men who cast these four ballots had announced or divulged, in the most open and objectionable manner, for whom he intended to vote, or had voted, his ballot would not have been rejected. Or if he had shown his ballot, unless such showing was clearly intentional, he would have been entitled to another ballot, and to vote. These facts should be considered when construing section 105 (G. S. 1894, § 110), and should cause a court to hesitate before placing a construction upon it which wholly deprives these men of a right to have their votes counted. I am of the opinion that such part of the section as relates to divulging how the voter intends to or has voted was solely designed to prevent noise, confusion, and indirect electioneering within the polling places, and that such part of the section as applies to the showing of ballots was directed against disorder and discussion at the polls, and also against the evil of vote traffic. Such showing would undoubtedly provoke discussion and disturbance. It would also facilitate corrupt practices. This part of the section was designed to take away the opportunity which those who bought votes might have for seeing, upon the spot and at a glance, whether corrupt bargains had been carried out. It was not intended to reach a case where, without a wrong motive, a voter marked his ballot so inconspicuously that the fact escaped the notice of the judges of election, and of the persons engaged, later on, and when a contest arose, in the recount.

But it is urged that trafficking in votes is made easy, if a voter can be allowed to mark his ballot so that, in some proceeding subsequent to the election, it may be learned how he voted.   If this be so, the remedy is with the legislature, and such a condition was suggested when the present law was enacted.   It is copied almost literally from some one of the statutes of other states which have adopted what is known as the "Australian Ballot System."   And in nearly every one of the statutes from which were taken the various provisions of chapter 4 (G. S. 1894, §§ 6–205) is found an explicit provision declaring absolutely void a ballot marked so that it may be identified or distinguished, while, by some, penalties are imposed for so marking.   Our law contains no such provisions.   The fact that they are omitted, although common elsewhere, is very significant, and convinces me, almost conclusively, that the omission was intentional, and that the legislature purposely declined to adopt so radical a feature.   It was thought, perhaps, that a voter might mark his ballot without intending to identify it, without the slightest idea of doing wrong, and wholly without corrupt motives, or that he might misapprehend or misunderstand the provisions of a new and novel system of election laws.   Possibly the members of the legislature had in mind that, in all the years elections have been held in this state, no case has been brought to public attention wherein it has been claimed that bribery or corruption has been aided or abetted by means of a marked ballot, and that, in all of our experience, legislation to guard against or to prevent an act of this nature has not been suggested.   And it is not unlikely that it was understood that if a ballot was marked, with an unlawful, corrupt motive, in aid of bribery, the remedy was ample and complete without a provision which disfranchised the voter who marked his ballot in the best of faith.   The chief objection which I have to the views expressed in the majority opinion is that without anything in the record to justify the conclusion, and without an expressed provision of the law, the voter, who, so far as we know, acted with pure motives when writing his name on the back of his ballot, is placed on a level with the bribe taker, who marks his ballot that it may be recognized by the bribe giver.   He is disfranchised, and thus punished as if his ballot had been shown at the polls, and the showing clearly intentional.   In the absence of any circumstance or any proof tend-

ing to indicate wrong, we should attribute the acts of these voters to an innocent error, or misunderstanding of the requirements of the statute.

But it is urged that, to prevent bribery, we must reject all ballots which are marked by the electors.   In view of the fact that the court is not confronted with a case in which corruption or bribery is suggested, and that no condition of affairs has heretofore arisen calling for drastic treatment, it seems to me that we are anticipating an evil which may never exist.   Again, the legislature saw fit to expressly authorize a voter to write the names of those for whom he voted on the face of the ballot, instead of compelling him to put a cross mark opposite the names  as printed.   If there is danger of facilitating corruption and bribery by means of ballots so marked that they can be distinguished, this method of indicating the voter's choice affords a most excellent opportunity, for the handwriting could easily be seen and recognized as the ballots are counted.   The legislature also saw fit to specify the manner in which alleged disabled and illiterate voters can have their ballots marked by others, and has conferred great power for harm on the judges of election, if they are vicious enough to use it, under our construction of these provisions in State v. Gay, 59 Minn. 6, 60 N. W. 676.   I need not specify wherein the irregularities therein considered (fourth subdivision of the opinion) are, in my judgment, much more liable to countenance and encourage corruption and bribery than the irregularity of placing one's name on the back of the ballot.   Nor will I take time and space to urge that, if the opportunity for the illiterate voter to convince the purchaser of votes that he has carried out his part of a corrupt bargain is not afforded by our construction of the law in that case, it ought not to be claimed that it is given the intelligent voter, if he be permitted to place his name on the back of his ballot. If we compare the dangers to be apprehended under our construction of the law, as set forth in State v. Gay, with those which seem imminent in the minds of the majority of the court, as expressed in the main opinion, it seems to me that the discrimination is most decidedly against the intelligent voter, and he, to say the least, is no more open to suspicion than is the illiterate one.   We have either opened the door too wide for the dishonest voter by the Gay Case, or we have closed it too tight for the honest voter in this.

Finally, in People v. Board, 129 N. Y. 395, 29 N. E. 327, the court remarked, when referring to the provision of the New York law which positively forbids the counting of marked ballots, that, "in the absence of a clear and positive prohibition in the statutes against counting such ballots, the tendency of the courts would undoubtedly be in the direction of effectuating as far as possible the intent of the voter." While this remark was obiter, an authority to the contrary has not been found. I think the ballots in question should be counted, and the intention of the voters who cast them effectuated, and on this point dissent from my brethren.