# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A16-0750

James Ariola, as next of kin of, and trustee for,
the Estate of Jack Ariola Erenberg, his son,
and the Class of Beneficiaries,
Pursuant to Minn. Stat. 573.02,
Appellant,

vs.

The City of Stillwater, Minnesota,
Respondent.

**Filed January 23, 2017**
**Affirmed in part, reversed in part, and remanded**
**Bratvold, Judge**

Washington County District Court
File No. 82-CV-13-1070

John R. Neve and Evan H. Weiner, Neve Webb, PLLC, Minneapolis, Minnesota (for appellant)

Pierre N. Regnier, Jessica E. Schwie, Jardine, Logan & O'Brien, PLLP, Lake Elmo, Minnesota (for respondent)

Considered and decided by Worke, Presiding Judge; Stauber, Judge; and Bratvold, Judge.

## S Y L L A B U S

1. A court-appointed trustee's failure to file an oath under Minn. Stat. § 573.02, subd. 3 (2016), does not deprive the court of subject-matter jurisdiction over a wrongful-death action that is timely and otherwise properly commenced.

2. A plaintiff who asserts the adult trespasser exception to recreational-use immunity under Minn. Stat. § 466.03, subd. 6e (2016) and the Restatement (Second) of Torts

§ 335 must establish a municipality's actual knowledge of an artificial condition likely to cause death or serious bodily harm. Thus, *Noland v. Soo Line R.R.*, 474 N.W.2d 4 (Minn. App. 1991), *review denied* (Minn. Sept. 13, 1991), is overruled.

**O P I N I O N**

**BRATVOLD**, Judge

Appellant James Ariola, as next of kin and trustee of the estate of his son, Jack Ariola Erenberg, appeals the district court's judgment dismissing his wrongful-death action against respondent City of Stillwater (the city) and the judgment taxing costs and disbursements against him personally. The district court granted the city's summary-judgment motion, dismissing the complaint with prejudice on two independent grounds. First, the district court found that it lacked subject-matter jurisdiction because Ariola did not file a trustee's oath within the three-year statute-of-limitations period for bringing a wrongful-death lawsuit. Second, the district court determined that the city was entitled to statutory recreational-use immunity. The district court concluded that no genuine issue of material fact was raised regarding whether the city had actual knowledge of an artificial condition likely to cause death or serious bodily harm under the adult trespasser exception to recreational-use immunity. We affirm in part, reverse in part, and remand for three reasons.

First, we conclude that the district court erred by dismissing Ariola's complaint for lack of subject-matter jurisdiction because Ariola is a duly appointed trustee, he timely filed this wrongful-death action, and the oath requirement in the wrongful-death statute is not a jurisdictional requirement.

2

Second, regarding recreational-use immunity, we hold that the adult trespasser exception requires a municipality to have actual knowledge of an artificial condition likely to cause death or serious bodily harm. Because the evidence Ariola submitted on summary judgment does not create a genuine issue of material fact that the city had actual knowledge of a danger, we affirm the district court's grant of summary judgment to the city.

Third, the district court made no finding of mismanagement or bad faith by Ariola under Minn. Stat. § 549.14 (2016). Thus, we reverse the district court's judgment of costs and disbursements against Ariola personally and remand to the district court for further proceedings consistent with this opinion.

**FACTS**

This is the second appeal in a wrongful-death lawsuit arising out of the death of nine-year-old Jack on August 6, 2012. *See Ariola v. City of Stillwater*, No. A14–0181, 2014 WL 5419809 (Minn. App. Oct. 29, 2014), *review denied* (Minn. Jan. 20, 2015). Jack died from primary amoebic meningoencephalitis (PAM), a brain infection that is 99% fatal. PAM is extremely rare. From 1962 to 2012, there were only 128 reported cases of PAM in the United States. Before 2010, there had never been a reported case of PAM as far north as Minnesota. PAM is caused by an amoeba in the water called *Naegleria fowleri* (NF). NF is unicellular and invisible to the human eye. It becomes dangerous to humans when it enters the nose and travels up the nasal passage into the brain.

In early August 2012, Jack was exposed to NF while swimming in Lily Lake, a body of fresh, untreated water located in the city of Stillwater. The lake abuts Lily Lake Park, which the city owns and maintains. The city improved Lily Lake by constructing park

3

facilities, including grills, a beach area, tennis courts, a dock, and a boat ramp. Lily Lake beach is the city's only public swimming beach. The city maintains the beach by grading it and adding sand above the water level.

In response to the city's summary-judgment motion, Ariola advanced two theories to explain NF's presence in Lily Lake. First, Ariola argued that NF occurred because the city constructed a storm-water system that directed runoff from a 587-acre, fully developed urban watershed into Lily Lake. The city's system was developed before "implementation of regulations requiring stormwater treatment, [and] there is minimal pretreatment of [the] runoff." One of the pipes is located within 30 meters of the public swimming area. Ariola's experts opined that "[t]here is a high probability that the untreated storm water run-off into Lily Lake was the source of the population of" NF in Lily Lake, and "[t]he presence of a zone of shallow waters would promote the growth of ameba [sic] populations in the warmer months."

Second, Ariola offered evidence that the city knew about pollution in Lily Lake but failed to remedy it. In the late 1990s and early 2000s, a citizen group started a campaign to improve Lily Lake's water quality and to raise awareness that storm-water runoff polluted Lily Lake.[1] Between 1995 and 2001, the city received six complaints from the citizen group, urging the city to adopt a plan to divert runoff away from Lily Lake or to filter the water.

---

[1] The citizen group alleged that the lake has poor water quality, calling it "dirty" and a "storm sewerage holding pond." The record contains numerous undated materials documenting the citizen group's efforts.

4

In June 1996, the city collaborated with the citizen group to develop a three-step plan to improve Lily Lake's water quality; specifically, that the city would construct three drainage and treatment systems to divert the flow of storm water into Lily Lake. Although the plan was approved by the city, only one of the three steps was completed.

The city took other steps to improve Lily Lake.[2] Despite these efforts, in 2006, Lily Lake was on the Minnesota Pollution Control Agency's "impaired waters" list, due to excessive nutrients and mercury in the water. In response, the city hired a consulting firm in 2007 to prepare a lake-management plan, which concluded that, while there is excess phosphorus and chlorophyll-a in Lily Lake, "water clarity is relatively good, with most years at or better than the State standard for deep lakes."

Ariola also claimed that the city should have known about NF because seven-year-old A.B., a Stillwater resident, died from PAM in August 2010. A.B.'s death was the first reported case of PAM in Minnesota, "the northernmost" state in which the infection had been confirmed. Media reaction to A.B.'s death was substantial. The *Star Tribune*, *Pioneer Press*, and *Stillwater Gazette* reported in August and September 2010 that A.B. contracted PAM after swimming in three Washington County bodies of water, including Lily Lake, in the last few weeks before her death.[3] The articles also reported comments by state

---

[2] In 1996 and 1999, the city hired consulting firms to evaluate the water and prepare a water-quality improvement plan. The city also collaborated with the Washington Conservation District to complete public education and outreach required by the Minnesota Pollution Control Agency. The Washington Conservation District sends volunteers to Lily Lake to regularly measure phosphorus and chlorophyll levels and to evaluate the clarity of the lake.

[3] The *Stillwater Gazette* article reported that A.B. died from PAM, "an extremely rare brain infection" that "is caused by an amoeba associated with warm freshwater." But the article

officials that NF is extremely rare, it was "impossible" to trace A.B's death to a particular body of water, the state had no plans to test local lakes for NF, the risk of NF to swimmers was "minuscule," and it was safe to continue swimming in Minnesota lakes.

Washington County, the Minnesota Department of Health (MDH), and the Centers for Disease Control (CDC) investigated A.B.'s death. In August and September 2010, the county assisted the MDH in collecting water and sediment samples from the three bodies of water in which A.B. swam to determine which had NF. In a September 1, 2010 e-mail, county employees were notified of a *Star Tribune* article reporting on A.B.'s death. The text of the e-mail states, in part: "Local units of government were unaware of potential relationship between illness and body of water in their jurisdiction." On September 15, 2010, the MDH notified the county that Lily Lake water and sediment samples tested positive for NF.

In November 2010, two MDH investigators told A.B.'s mother that NF in Lily Lake had caused her daughter's death. A.B.'s mother testified that the MDH did not tell her to keep this information confidential, and she assumed that the MDH would share the information with the city. A.B.'s mother also testified that, while she disclosed the cause of her daughter's death to her friends and family, she did not tell the city.

In 2011 and 2012, the county partnered with the CDC to take water and sediment samples from ten lakes in Minnesota, including Lily Lake. In 2011, Lily Lake was one of

did not mention Lily Lake or state which bodies of water A.B. swam in before her death. The majority of the article discussed A.B.'s funeral and the impact that A.B.'s death had on her family.

6

five lakes that tested positive for NF. On July 13, 2012, before the 2012 samples were collected, an MDH employee told the county that he was "nervous about the potential for more PAM cases given the extremely hot weather we've been having." On August 17, 2012, after Jack's death, the CDC notified the county that Lily Lake's sediment samples contained NF.

The city administrator and city engineer/public works director testified that the city has no public health department and relies on the county for information. City testimony also established that it has a close relationship with the county, and the city would have expected the county to share important public health information. Yet, the Washington County Director of the Public Health and Environment Department stated in an affidavit that the county partnered only with the CDC and MDH in investigating A.B.'s death.[4]

In January 2012, the Oxford University Press published a scholarly article in the journal, *Clinical Infectious Diseases*, titled "Fatal *Naegleria fowleri* Infection Acquired in Minnesota: Possible Expanded Range of a Deadly Thermophilic Organism." The article describes a young girl as the first person to die from PAM in Minnesota and discusses water and sediment sampling of the three bodies of water in which the girl swam in the last few weeks before her death. The article states that all three bodies of water are located in Washington County, Minnesota, but does not specifically mention their names; rather, the

---

[4] In an August 2012 news article published after Jack's death, city officials, including the mayor, are quoted, stating that they were unaware of A.B.'s death before Jack died. The county director of the public health and environment department is also quoted, stating that the county specifically decided not to tell the city about A.B.'s death "since it was such a rare occurrence at the time."

7

article refers to a river, "Lake A," and "Lake B." The article reports that Lake A tested positive for NF and provides a photograph of Lake A. Testimony offered by Ariola establishes that the "Lake A" photograph is recognizable as Lily Lake.

Ariola deposed three city officials and all three—the city administrator, city engineer/public works director, and the city public works superintendent—testified that they had not seen or read any newspaper articles or the scholarly article reporting on A.B.'s death, NF, and the link to swimming in Lily Lake. The city subscribes to the *Pioneer Press* and *Stillwater Gazette*, but not the *Star Tribune* or *Clinical Infectious Diseases*. The city administrator agreed that it is safe to assume that some city employees read these newspapers. Nonetheless, nothing in the record established that any city employee had received, reviewed, or discussed any of the six media articles about A.B.'s death that Ariola filed on summary judgment.

The three city officials also testified that, before Jack's death, they were unaware that A.B. had died from NF after swimming in Lily Lake, that Lily Lake contained a dangerous substance, or that the county, MDH, and CDC had taken samples from Lily Lake for testing. The city also submitted affidavits by six city public works employees, who asserted that they did not know, before Jack died, about NF, that anyone had died from an amoeba in Lily Lake, that Lily Lake contained an amoeba that might cause death, or that the county had tested Lily Lake to determine if it contained a dangerous amoeba. No testimony or affidavit contradicted these assertions.

After A.B.'s death, Lily Lake remained open to the public. Signs posted in Lily Lake Park warned of various risks, such as swimming without a lifeguard on duty, but did not

warn of the risk of NF. After Jack's death, the city closed Lily Lake beach and posted "No Swimming" signs that warned of the risk of NF.

### *Procedural History*

On November 8, 2012, Ariola filed a verified petition asking the district court to appoint a trustee to bring a wrongful-death lawsuit on behalf of Jack's next of kin. The petition included Ariola's written consent to serve as trustee and a certification by a public notary that it was "sworn to and subscribed by James Ariola in [the notary public's] presence this 30th day of October 2012."

On December 21, 2012, the district court granted Ariola's petition. That same day, Ariola filed suit against Washington County, the MDH, the city, and the city's parks and recreation commission.[5] All defendants moved to dismiss the complaint, which Ariola had amended, for failure to state a claim upon which relief may be granted. While the motions were pending, Ariola moved for leave to file a second amended complaint, seeking to voluntarily dismiss the claims against the parks and recreation commission and clarify allegations against the remaining defendants.

On December 5, 2013, the district court granted each defendant's motion to dismiss and denied leave to file a second amended complaint because the claims "would necessarily

---

[5] Ariola initially filed suit in Dakota County, but the defendants immediately moved for a change of venue to Washington County. While the motion was pending, Ariola filed his first amended complaint and a copy of the appointment order. In February 2013, the district court granted the defendants' motion to transfer venue to Washington County, and Ariola refiled his complaint and appointment order.

fail as a matter of law." Relevant to this appeal, the district court concluded that Ariola's claims against the city were barred by recreational-use immunity.

Ariola appealed, and on October 27, 2014, this court affirmed the dismissal of claims against the county and MDH, but reversed the dismissal of claims against the city. *See Ariola*, 2014 WL 5419809.[6] We concluded that the first amended complaint "pleaded facts sufficient to support a claim of trespasser liability and thus to overcome the city's recreational-use immunity." *Id.* at *4. We remanded to the district court for further proceedings.

The parties proceeded with the second amended complaint and the city filed its answer, asserting statutory immunity, lack of standing and statutory authority to sue as trustee, and lack of jurisdiction as affirmative defenses. The city moved for summary judgment on three grounds: (1) lack of subject-matter jurisdiction because Ariola failed to file a trustee's oath within the three-year statute-of-limitations period for bringing a wrongful-death action; (2) recreational-use immunity; and (3) wild-animal immunity.

On March 4, 2016, the district court granted the city's summary-judgment motion, dismissing all of Ariola's claims with prejudice.[7] The city filed an application to tax its

---

[6] Briefly stated, this court affirmed the dismissal of claims against the county and MDH because they did not owe Jack a duty of care and, therefore, could not be held liable for negligence. *Ariola*, 2014 WL 5419809, at *6–9. This court concluded that the public-duty doctrine applied, which "requires that a governmental unit owe the plaintiff a duty different from that owed to the general public in order for the governmental unit to be found liable," and neither the county nor MDH owed Jack a special duty of care to overcome the public-duty doctrine. *Id.* (quotation omitted).

[7] The district court dismissed the complaint because it determined it lacked subject-matter jurisdiction and the city was entitled to recreational-use immunity as a matter of law. The district court declined to grant summary judgment on the basis of the city's alternative

10

costs and disbursements as the prevailing party. Ariola objected, asserting that he is not personally liable for the costs and disbursements because he is a trustee and did not sue in his personal capacity. On April 11, 2016, the district court entered judgment for the city, taxing $2,528.10 in costs and disbursements against Ariola. This appeal follows.

## ISSUES

I.     Did the district court err by determining that it lacked subject-matter jurisdiction because Ariola failed to file a trustee's oath before the statute of limitations expired for bringing this wrongful-death lawsuit?

II.    Did the district court err by granting summary judgment to the city on the basis of recreational-use immunity?

III.   Did the district court abuse its discretion by taxing costs and disbursements against Ariola personally?

## ANALYSIS

**I.     The district court has subject-matter jurisdiction over this wrongful-death action.**

As an initial matter, we address whether the statute-of-limitations issue is properly characterized as subject-matter jurisdiction.[8] Generally, a statute of limitations provides an

---

argument that it was entitled to wild-animal immunity, reasoning that proximate cause raised fact questions for the jury to resolve. Because we affirm the district court's summary-judgment award on the basis of recreational-use immunity, we do not address wild-animal immunity. *See Winkler v. Magnuson*, 539 N.W.2d 821, 828 (Minn. App. 1995) ("[S]ummary judgment should be affirmed if it can be sustained on any ground."), *review denied* (Minn. Feb. 13, 1996).

[8] We note a backdrop of uncertainty around the word "jurisdictional" and its use. For example, the U.S. Supreme Court has cautioned that "jurisdiction . . . is a word of many, too many, meanings." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90, 118 S. Ct. 1003, 1010 (1998). The Court has called for courts and litigants to use the label "jurisdictional" only for "prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory

affirmative defense that is waivable by defendants. *Albers v. Fitschen*, 274 Minn. 375, 377, 143 N.W.2d 841, 843 (1966). On the other hand, subject-matter jurisdiction cannot be waived. *McCullough & Sons v. City of Vadnais Heights*, 883 N.W.2d 580, 590 (Minn. 2016). But the Minnesota Supreme Court has noted that a statute of limitations may implicate subject-matter jurisdiction in some instances. When the limitations provision relates to a statutorily created cause of action, a plaintiff's failure to comply with the statute of limitations requires the court to dismiss the claim, even if the defendant did not raise the issue. *Carlton v. State*, 816 N.W.2d 590, 601 (Minn. 2012). Dismissal is required "because the court in such a case has no jurisdiction to hear the untimely claim, as compliance with the time period is a condition of the statutory right." *Id.* (citation omitted).

A wrongful-death claim is "purely statutory, as common law recognized no such actions on the theory that a claim for personal injuries died with the victim." *Ortiz v. Gavenda*, 590 N.W.2d 119, 121 (Minn. 1999). Accordingly, the three-year statute of limitations provided in Minnesota's wrongful-death statute, Minn. Stat. § 573.02, is "jurisdictional, requiring dismissal for failure to comply" and does "not have flexible parameters permitting [it] to be ignored if [its] application is too technical." *Ortiz*, 590 N.W.2d at 122 (quotation omitted); *see also Berghuis v. Korthuis*, 228 Minn. 534, 536, 37 N.W.2d 809, 810 (1949) ("This period fixing the time within which the right of action for

---

authority." *Kontrick v. Ryan*, 540 U.S. 443, 455, 124 S. Ct. 906, 915 (2004). Citing *Kontrick,* this court has also cautioned against misuse of the word "jurisdictional." *Save Our Creeks v. City of Brooklyn Park*, 682 N.W.2d 639, 642–43 (Minn. App. 2004) (holding that absence of attorney signature on complaint brought by corporation is not jurisdictional defect), *aff'd,* 699 N.W.2d 307 (Minn. 2005).

wrongful death may be exercised is not an ordinary statute of limitations. It is considered a condition precedent to the right to maintain the action, and the lapse of such period is an absolute bar."). Based on our caselaw, we conclude that the city's statute-of-limitation defense implicates the court's subject-matter jurisdiction. Subject-matter jurisdiction "is a question of law that we review de novo." *Nelson v. Schlener*, 859 N.W.2d 288, 291 (Minn. 2015).[9]

Turning to the city's jurisdictional argument, it contends that (1) Ariola failed to comply with the statutory requirement of filing an oath before commencing this wrongful-death action; (2) this failure rendered the complaint a nullity; and (3) the three-year statute-of-limitations period has now expired, preventing the court from exercising subject-matter jurisdiction over this case. We address each contention in turn.

### A.     Ariola did not comply with the oath requirement in the wrongful-death statute.

Minnesota's wrongful-death statute provides for appointment of a trustee, as follows:

> Upon written petition by the surviving spouse or one of the
> next of kin, the court having jurisdiction of an action falling
> within the provisions of subdivisions 1 or 2, shall appoint a
> suitable and competent person as trustee to commence or
> continue such action and obtain recovery of damages therein.
> The trustee, before commencing duties shall file a consent and

---

[9] Ariola argues that the city waived the statute-of-limitations issue. We disagree because the city has raised a subject-matter jurisdiction issue, which cannot be waived by any party.

13

oath. Before receiving any money, the trustee shall file a bond as security therefor in such form and with such sureties as the court may require.

Minn. Stat. § 573.02, subd. 3.

The parties do not dispute that the district court properly appointed Ariola as trustee.[10] The city argues that Ariola did not file an oath before commencing the suit, as required by section 573.02, subdivision 3. Ariola responds that his appointment petition includes his written consent to serve as trustee, and a certification by a notary public that the petition and written consent were "sworn to and subscribed by James Ariola in [the notary public's] presence this 30th day of October 2012." Stressing that the wrongful-death statute does not specify the type of oath a trustee must file, Ariola argues that the public notary's certification on his appointment petition is sufficient written evidence of an oath. Ariola does not offer any other evidence of an oath taken or filed by him. Nor does Ariola dispute that the limitations period for bringing this wrongful-death action expired in August 2015, well before the city brought its motion for summary judgment. Minn. Stat. § 573.02, subd. 1 (2016) (providing a three-year statute of limitations from the time of death when there is no allegation that the defendant intentionally caused the death).

---

[10] It is also undisputed that Ariola's petition generally complied with Minnesota General Rule of Practice 144, which is the "comprehensive framework for the appointment of a" wrongful-death trustee. *Ortiz*, 590 N.W.2d at 123. Rule 144 requires a wrongful-death trustee to file a verified petition containing the applicant's written consent to assume duties as trustee. Minn. R. Gen. Pract. 144.01. The city points out that rule 144.04 requires the trustee to file the oath in the district court if the action is transferred to a county other than the one in which the trustee was appointed. Despite this reference to the oath, rule 144 does not clarify the statutory oath requirement, and it is not relevant to our jurisdictional analysis.

14

The parties' dispute over the oath requirement presents a question of statutory interpretation, which appellate courts review de novo. *Swenson v. Nickaboine*, 793 N.W.2d 738, 741 (Minn. 2011). The goal of statutory interpretation is to "'ascertain and effectuate the intention of the legislature.'" *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 836 (Minn. 2012) (quoting Minn. Stat. § 645.16 (2010)). To this end, we must first determine whether the statute's language, on its face, is ambiguous. *Larson v. State*, 790 N.W.2d, 700, 703 (Minn. 2010). "A statute is ambiguous if it is reasonably susceptible to more than one interpretation." *State by Beaulieu v. RSJ, Inc.*, 552 N.W.2d 695, 701 (Minn. 1996). To determine whether a statute is ambiguous, this court will construe the statute's words and phrases according to their plain and ordinary meaning. *Christianson v. Henke*, 831 N.W.2d 532, 536 (Minn. 2013). When a word has a variety of meanings, we examine the context in which the word appears. *Cocchiarella v. Driggs*, 884 N.W.2d 621, 625 (Minn. 2016). When a statute is held to be unambiguous, "the court's role is to enforce the language of the statute and not explore the spirit or purpose of the law." *Caldas*, 820 N.W.2d at 836 (citing Minn. Stat. § 645.16).

The first step in our analysis is to ascertain whether the statutory oath requirement is ambiguous. Section 573.02, subdivision 3, does not define "oath." Our caselaw has defined "oath" generally as "all forms of attestation by which a party signifies that he is bound in conscience to perform an act faithfully and truthfully." *State v. Gay*, 59 Minn. 6, 21, 60 N.W.2d 676, 677 (1894). *Black's Law Dictionary* offers the following definition: "A solemn declaration, accompanied by a swearing to God or a revered person or thing, that one's statement is true or that one will be bound to a promise. The person making the

15

oath implicitly invites punishment if the statement is untrue or the promise is broken." *Black's Law Dictionary* 1239 (10th ed. 2014).

The Minnesota Statutes provide for two types of oaths, consistent with the *Black*'s definition: (1) oaths declaring that one's statement is true, and (2) oaths declaring one's promise to perform certain acts and duties in a prescribed manner. Minnesota Statutes section 358.07 (2016) is the first type of oath because it enumerates that witnesses are required to swear that "the evidence [witness] shall give relative to the cause now under consideration shall be the whole truth, and nothing but the truth," and affiants are required to swear that "the statements of this affidavit, by [affiant] subscribed, are true." Minn. Stat. § 358.07 (7), (10). Minnesota Statutes section 358.06 (2016) is an example of the second type of oath and provides that, "unless otherwise provided by law, every executor, administrator, guardian, trustee . . . and other person appointed by or made responsible to the court in any action or proceeding" must take and subscribe an oath to "faithfully and justly perform all the duties of the office and trust . . . to the best of [one's] ability." Minn. Stat. § 358.06.

The word "oath" in the wrongful-death statute, when read in isolation, does not clearly refer to either type of oath. But the context in which "oath" appears in the wrongful-death statute clarifies any possible ambiguity. *Christianson*, 831 N.W.2d at 537 ("Multiple parts of a statute may be read together so as to ascertain whether the statute is ambiguous."). Specifically, Minn. Stat. § 573.02, subd. 3, states that "[t]he trustee, *before commencing duties* shall file a consent and oath." (Emphasis added.) By referring to the trustee's duties

16

when establishing the oath requirement, the wrongful-death statute indicates that the oath is an affirmation by the trustee of faithful performance of duties.

We conclude that the oath requirement in the wrongful-death statute unambiguously refers to the trustee's promise to faithfully carry out the duties of the appointment, namely to act in the best interests of the next of kin. Here, there is nothing in the record showing that Ariola took and filed such an oath. The notary public's certification that Ariola's appointment petition and consent were "sworn to and subscribed" establish that Ariola attested to the veracity of his statements in the petition. While the notary's certification established Ariola's compliance with the requirement that he file a verified petition, it does not satisfy the statutory oath requirement. Therefore, we agree with the district court that Ariola did not comply with the oath requirement in Minn. Stat. § 573.02, subd. 3.

**B.** **The oath requirement is not a jurisdictional requirement for a wrongful-death action.**

The district court concluded that the oath requirement was jurisdictional, relying on caselaw holding that the appointment requirement is jurisdictional. In *Ortiz*, the Minnesota Supreme Court held that a widow, who had not been appointed as a trustee before the limitations period expired, could not cure the defect in her purported wrongful-death complaint because the appointment requirement is jurisdictional. 590 N.W.2d at 123–24; *see also Regie de l'assurance Auto. du Quebec v. Jensen*, 399 N.W.2d 85 (Minn. 1987) (holding that, because a non-trustee lacks standing to bring a wrongful-death suit, a non-trustee's filing of the action was a nullity). The district court reasoned that the absence of

17

the oath is like the absence of an appointment order, therefore, Ariola's complaint has a fatal defect and the wrongful-death claim is jurisdictionally barred.

But, the wrongful-death statute is silent as to whether filing a trustee's oath is a jurisdictional requirement for bringing a timely wrongful-death action. To ascertain whether the oath requirement is jurisdictional, an issue of first impression in Minnesota, we first examine the plain language of the statute and then discuss the statutory framework and purpose. Minn. Stat. § 645.16; *Eischen v. Cabinet Co. v. Hildebrandt*, 683 N.W.2d 813, 816–18 (Minn. 2004) (where statutory language is silent, consideration of the statute's purpose and other general legal authorities is relevant to statutory construction analysis).

The relevant statute of limitations is in Minn. Stat. § 573.02, subd. 1, which provides:

> When death is caused by the wrongful act or omission . . . *the trustee appointed* as provided in subdivision 3 may maintain an action therefor if the decedent might have maintained an action, had the decedent lived, for an injury caused by the wrongful act or omission. . . . Any [action not based on an intentional act or omission of the defendant] may be commenced within three years after the date of death provided that the action must be commenced within six years after the act or omission."

Minn. Stat. § 573.02, subd. 1 (emphasis added). The plain language of subdivision 1 refers only to the appointment of a trustee. Interpreting subdivision 1, we have held that "it is the trustee who has the exclusive right to maintain" a wrongful-death action. *Kolles v. Ross*, 418 N.W.2d 733, 738 (Minn. App. 1988), *review denied* (Minn. Mar. 30, 1988).

The oath requirement, on the other hand, appears only in subdivision 3 of the wrongful-death statute. The statutory framework is telling; the legislature's placement of

18

the oath requirement in a different subdivision than the statute-of-limitations provision suggests that it is not a condition precedent to filing a timely wrongful-death lawsuit. *Am. Family Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000) ("While statutory construction focuses on the language of the provision at issue, it is sometimes necessary to analyze that provision in the context of surrounding sections."). If the legislature had intended to link the oath requirement with the limitations provision, it could have said, "the trustee appointed and sworn as provided in subdivision 3 may maintain" a wrongful-death action. Thus, reading the plain text of the wrongful-death statute as a whole establishes that the oath requirement in subdivision 3, while mandatory for trustees, is not a jurisdictional requirement for maintaining a wrongful-death action.

Our interpretation of the plain text is supported by an analysis of the purposes served by the appointment and oath requirements in section 573.02. *Goodman v. Best Buy, Inc.*, 777 N.W.2d 755, 758 (Minn. 2010) ("In reading the statute, it is necessary to consider not only the bare meaning of the word or phrase, but also its placement and purpose in the statutory scheme." (quotation omitted)). The appointment requirement serves the essential function of identifying who has standing to commence a wrongful-death action. *Save Our Creeks*, 682 N.W.2d at 648 ("[I]t is the appointment of the trustee that forms the legal capacity for a successor of the deceased to bring or to continue the action for wrongful death."). Indeed, the appointment requirement protects the integrity of the wrongful-death action itself, to the benefit of defendants and the next of kin, so that the action can be resolved and not usurped by successive purported trustees. *Ortiz*, 590 N.W.2d at 124 ("The appointment of a trustee under Minn. Stat. § 573.02 is an exercise of the fundamental legal

principle that those entitled to recovery as a result of the wrongful death shall be represented by the trustee without compromise.").

In contrast, the oath requirement affirms a trustee's duties to the next of kin. While an important requirement for which compliance is mandatory, the oath pertains to duties that are imposed by law, even if an oath is not sworn. This court has held that the duty of a wrongful-death trustee is to act as a fiduciary for the next of kin. *Kolles*, 418 N.W.2d at 738 (holding that a wrongful-death trustee may not bring a separate action or negotiate a settlement for her exclusive benefit). Indeed, a trustee fulfills one of its fiduciary duties by timely filing a wrongful-death action on behalf of the next of kin. The oath requirement thus provides a redundant benefit to the next of kin; it should not be construed as a trap to cut off all relief to the next of kin.

Based on the plain language of section 573.02 and its statutory framework, in which the limitations period for wrongful-death actions is separated from and does not refer to the oath requirement in subdivision 3, we conclude that the oath requirement is not jurisdictional. Any other conclusion would require this court to add words to subdivision 1, something that we will not do. *Rohmiller v. Hart*, 811 N.W.2d 585, 591 (Minn. 2012) ("We cannot add words or meaning to a statute that were intentionally or inadvertently omitted."). Thus, when a wrongful-death trustee has been properly and timely appointed, leaving no doubt of his "exclusive right" to bring and maintain a wrongful-death action,

the trustee's failure to file the required oath does not render a timely filed complaint fatally defective or null.[11]

In sum, we conclude that the oath requirement in Minn. Stat. § 573.02, subd. 3, is mandatory, but not jurisdictional, and noncompliance can be cured. *Cf. Save Our Creeks*, 682 N.W.2d at 643 (requirement that counsel sign the complaint is non-jurisdictional and may be cured). Thus, the district court erred when it determined that Ariola's failure to file the required trustee's oath rendered his complaint a nullity. Accordingly, we reverse and hold that the district court erred in concluding that it lacked subject-matter jurisdiction over this case.

## II.     The city is entitled to summary judgment based on recreational-use immunity.

### A.     Standard of review

Whether a municipality is protected by statutory immunity is a legal question that this court reviews de novo. *Johnson v. State*, 553 N.W.2d 40, 45 (Minn. 1996). This court also reviews "a district court's summary judgment decision de novo," analyzing "whether the district court properly applied the law and whether there are genuine issues of material

---

[11] Our view is consistent with the Supreme Court's analysis of other oath requirements. In *Edelman v. Lynchburg Coll.*, the plaintiff timely faxed a charge of discrimination to the Equal Employment Opportunity Commission, but did not include an oath or affirmation as required by statute. 535 U.S. 106, 106, 122 S. Ct. 1145, 1145 (2002). The plaintiff filed an amended charge with the required oath or affirmation after the expiration of the statute of limitations. *Id.* The Court upheld a regulation that allowed the untimely amended charge to relate back to the original charge to ensure that the complainant "will not risk forfeiting his rights inadvertently." *Id.* at 115; 122 S. Ct. at 1150; *see also Becker v. Montgomery*, 523 U.S. 757, 767–68, 121 S. Ct. 1801, 1808 (2001) ("[I]mperfections in noticing an appeal should not be fatal where no doubt exists about who is appealing, from what judgment, to which appellate court."). The reasoning in these cases is similar to this court's reasoning in *Save Our Creeks*, 682 N.W.2d at 642–43.

fact that preclude summary judgment." *Riverview Muir Doran, LLC v. JADT Dev. Grp., LLC*, 790 N.W.2d 167, 170 (Minn. 2010) (citation omitted). A summary-judgment award will "be affirmed if it can be sustained on any ground." *Winkler*, 539 N.W.2d at 828.

On a motion for summary judgment, "[j]udgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. Evidence is viewed "in the light most favorable to the nonmoving party" and all doubts are resolved against the moving party. *Rochester City Lines, Co. v. City of Rochester*, 868 N.W.2d 655, 661 (Minn. 2015), *cert. denied*, 136 S. Ct. 849 (2016).

"When a motion for summary judgment is made and supported, the nonmoving party must 'present specific facts showing that there is a genuine issue for trial.'" *DLH, Inc. v. Russ*, 566 N.W.2d 60, 69 (Minn. 1997) (quoting Minn. R. Civ. P. 56.05). "[T]here is no genuine issue of material fact for trial when the nonmoving party presents evidence which merely creates a metaphysical doubt as to a factual issue." *Id.* at 70. Summary judgment, however, is a "blunt instrument," and is inappropriate when reasonable persons might draw different conclusions from the evidence presented. *Osborne v. Twin Town Bowl, Inc.*, 749 N.W.2d 367, 371 (Minn. 2008) (quotation omitted). Nevertheless, "[m]ere speculation, without some concrete evidence, is not enough to avoid summary judgment." *Id.* (alteration in original) (quotation omitted).

**B.      Recreational-use immunity and the trespasser exception**

Generally, municipalities are liable for their own torts and those of their "officers, employees and agents acting within the scope of their employment." Minn. Stat. § 466.02 (2016). The legislature has carved out certain statutory exceptions to municipal tort liability. Minn. Stat. § 466.03 (2016). Relevant here, municipalities are immune from some claims based on use of parks and recreation areas, as follows:

> [Liability does not apply to] [a]ny claim based upon the construction, operation, or maintenance of any property owned or leased by the municipality that is intended or permitted to be used as a park, as an open area for recreational purposes, or for the provision of recreational services, or from any claim based on the clearing of land, removal of refuse, and creation of trails or paths without artificial surfaces, if the claim arises from a loss incurred by a user of park and recreation property or services.

*Id.*, subd. 6e. This so-called "recreational-use immunity" does not wholly absolve municipalities from liability. Subdivision 6e also provides that "[n]othing in this subdivision limits the liability of a municipality for conduct that would entitle a trespasser to damages against a private person." *Id.* The "trespasser exception" means that a municipality "is liable only if it violated the standard of care that a private landowner owes to a trespasser." *Fear v. Indep. Sch. Dist. 911*, 634 N.W.2d 204, 213 (Minn. App. 2001), *review denied* (Minn. Dec. 11, 2001). "The plaintiff bears the burden of establishing that each of the elements of [the trespasser exception] has been met in order to defeat a claim of immunity." *Martinez v. Minn. Zoological Gardens*, 526 N.W.2d 416, 418 (Minn. App. 1995), *review denied* (Minn. Mar. 29, 1995).

Minnesota has adopted the Restatement (Second) of Torts as "[t]he standard for determining whether a trespasser is entitled to damages" against a municipality under the trespasser exception. *Steinke v. City of Andover*, 525 N.W.2d 173, 176 (Minn. 1994). The Restatement establishes two standards of care owed to trespassers. Section 335 is the generally applicable "adult" trespasser standard, and section 339 is the more stringent "child" trespasser standard of care.

In the first appeal, this court held that the section 335 adult trespasser standard applies because Jack was accompanied by adults while swimming in Lily Lake. *Ariola*, 2014 WL 5419809, at *3 (citing *Johnson v. Washington County*, 518 N.W.2d 594, 599 (Minn. 1994)).[12] Under the law-of-the-case doctrine, this court is bound by the issues that were decided in the first appeal. *See Sigurdson v. Isanti County*, 448 N.W.2d 62, 66 (Minn. 1989). Thus, we will apply the section 335 adult standard of care in this appeal. Under this standard, a plaintiff seeking to overcome recreational-use immunity must establish that injury or death was caused by (a) a concealed or hidden artificial condition that was (b) created or maintained by the municipality, and that (c) the municipality knew that the condition was likely to cause death or serious bodily harm. *Prokop v. Indep. Sch. Dist. No. 625*, 754 N.W.2d 709, 714 (Minn. App. 2008); *see also* Restatement (Second) of Torts § 335 (1965).

---

[12] In the first appeal, we reversed the district court's dismissal of Ariola's claims at the motion-to-dismiss stage, but expressed no opinion regarding the viability of Ariola's claims under a summary-judgment standard. *Ariola*, 2014 WL 5419809, at *6.

In granting the city's summary-judgment motion, the district court focused on the third element and concluded that there is no genuine issue of material fact regarding the city's actual knowledge before Jack died. Because the record contained no evidence that the city actually knew of any condition in Lily Lake that was likely to cause death or serious bodily harm, the district court concluded that the city was entitled to relief as a matter of law under recreational-use immunity, and did not address the other elements of the adult trespasser exception.

On appeal, Ariola contends that the district court erred because there is a fact question whether the city knew about an artificial condition in Lily Lake likely to cause death or serious bodily harm.[13] Our analysis begins with determining the correct legal standard for the city's knowledge and then proceeds with determining whether a fact question exists.

1.  **Standard for assessing the city's knowledge under the trespasser exception**

The Minnesota Supreme Court has not decided whether actual or constructive knowledge of an artificial condition likely to cause death or serious bodily harm is required for the adult trespasser exception to recreational-use immunity. In six published cases over

---

[13] Ariola and the city differ in how they identify the relevant artificial conditions. Ariola identifies four conditions he argues are artificial conditions that were proximate causes of Jack's death: (a) park facilities constructed and maintained by the city that attracted swimmers to the lake; (b) the shallow swimming area that created prime conditions for NF to thrive; (c) storm-water piping that introduced NF into the lake; and (d) signs posted at the lake that failed to warn swimmers of the risk of NF. The city responds that it is undisputed that NF was the direct cause of Jack's death, and NF is a natural, not artificial, condition. Because we affirm the district court's decision on the third element of the adult trespasser exception, we do not discuss the parties' dispute about the artificial conditions.

the course of nearly thirty years, this court has expressly held that actual knowledge is required. *Krieger v. City of St. Paul*, 762 N.W.2d 274, 278 (Minn. App. 2009); *Prokop*, 754 N.W.2d at 715; *Lundstrom v. City of Apple Valley*, 587 N.W.2d 517, 520 (Minn. App. 1998); *Cobb v. State, Dep't of Nat. Res.*, 441 N.W.2d 839, 841–42 (Minn. App. 1989); *Lawler v. Soo Line R.R.*, 424 N.W.2d 313, 317 (Minn. App. 1988), *review denied* (Minn. Aug. 24, 1988); *Henry v. State*, 406 N.W.2d 608, 612 (Minn. App. 1987), *review denied* (Minn. Aug. 12, 1987).

One exception is *Noland v. Soo Line R.R.*, which applied a constructive knowledge standard.[14] 474 N.W.2d 4, 6 (Minn. App. 1991), *review denied* (Minn. Sept. 13, 1991). *Noland* stated that a plaintiff need not "show a landowner had actual knowledge that an artificial condition was dangerous to satisfy the requirement that the landowner knew the condition was likely to cause death or serious bodily harm. A plaintiff need only show that the landowner realized or should have realized the potential danger." *Id.*[15] Ariola argues

---

[14] Our caselaw applying the adult trespasser exception to recreational-use immunity has interpreted constructive knowledge as a knew-or-should-have-known standard. *See, e.g.*, *Prokop*, 754 N.W.2d at 715 ("Appellants next argue that respondent should have known of the danger, arguing that the danger posed by the L-screen was obvious. But this applies a constructive-knowledge standard. . . . [A]ctual knowledge is required."). In negligence cases, the supreme court has stated that constructive notice of a hazardous condition requires proof "that the municipality in the exercise of reasonable diligence to discover and remedy defects should have known of its existence." *Kopveiler v. N. Pac. Ry.*, 280 Minn. 489, 493, 160 N.W.2d 142, 146 (1968). On the other hand, we have defined actual knowledge as knowledge that "is generally 'given directly to, or received personally by, a party.'" *Wash. Mut. Bank, F.A. v. Elfelt*, 756 N.W.2d 501, 507 (Minn. App. 2008) (quoting *Black's Law Dictionary* 1090 (8th ed. 2004)). Based on this precedent, we use the term "constructive knowledge" to refer to information that an actor knew or should have known. Actual knowledge, in contrast, must be given to or received by an actor.

[15] *Noland* relied on comment d to section 335, which provides: "The rule stated in this Section applies only where the artificial condition is one which the possessor has

26

that constructive knowledge is sufficient because it "best comports with the Restatement and with sound public policy."

The doctrine of stare decisis guides our decision on this issue because it "directs that we adhere to former decisions in order that there might be stability in the law." *Doe v. Lutheran High Sch. of Greater Minneapolis*, 702 N.W.2d 322, 330 (Minn. App. 2005) (quotation omitted), *review denied* (Minn. Oct. 26, 2005). "Stare decisis is not an inflexible rule of law but rather a policy of the law." *Johnson v. Chicago, Burlington & Quincy R.R.*, 243 Minn. 58, 68, 66 N.W.2d 763, 770 (1954). We will only overrule our precedent if provided with a compelling reason to do so. *Fleeger v. Wyeth*, 771 N.W.2d 524, 529 (Minn. 2009). "[T]he reasons for departing from former decisions [must] greatly outweigh reasons for adhering to them." *Johnson*, 243 Minn. at 68, 66 N.W.2d at 770.

We conclude that there are at least three compelling reasons to overrule *Noland*. First, *Noland* is the only published decision that announced a constructive knowledge standard. Six other published decisions have stated that the adult trespasser exception requires actual knowledge. Notably, our three most recent published decisions specifically held that actual knowledge is required.

Second, recent decisions appear to implicitly overrule *Noland*, but this case demonstrates that *Noland* continues to create confusion for district courts, counsel, and parties, causing unnecessary use of resources in litigating this issue. Because section 335

---

knowingly created or maintained and which he realizes or should realize will involve a risk of death or serious bodily harm." *Noland*, 474 N.W.2d at 6; *see* Restatement (Second) of Torts § 335 cmt. d (1965).

of the Restatement defines an exception to municipal tort immunity, consistent interpretation and clear direction from this court is crucial in establishing the scope of a municipality's potential tort liability for parks and recreational areas.

Third, the actual knowledge standard is consistent with the text of section 335, which provides that the landowner may be liable for injury caused by an artificial condition that "is, *to his knowledge*, likely to cause death or serious bodily harm." Restatement (Second) of Torts § 335 (1965) (emphasis added). This court has aptly explained that "section 335 of the Restatement requires actual knowledge rather than employing the 'reason to know' standard found elsewhere in the Restatement." *Henry*, 406 N.W.2d at 612. Accordingly, for these three reasons, we overrule *Noland*. We hold that, consistent with the majority of this court's published decisions applying section 335, a municipality's actual knowledge of an artificial condition likely to cause death or serious bodily harm is required to establish the adult trespasser exception to recreational-use immunity.

### 2.  Summary-judgment analysis

Initially, the parties dispute the type of evidence on which Ariola may rely in proving the city's actual knowledge; we will address this issue before reviewing the record evidence. Ariola argues that he can prove actual knowledge with circumstantial evidence. The city contends that direct evidence is required.[16] The city's argument is without merit.

---

[16] The city cites *Cobb v. Dep't of Nat. Res.*, which held that the district court erred by applying "a constructive knowledge standard based upon inferential evidence" in analyzing the government entity's knowledge under section 335. 441 N.W.2d at 841. But *Cobb* does not stand for the proposition that a plaintiff cannot prove actual knowledge with circumstantial evidence. Rather, the district court's error in *Cobb* was applying a

In civil cases, a fact may be proved through direct or circumstantial evidence and "[t]he law makes no distinction between the weight given to either" type of evidence. 4 *Minnesota Practice*, CIVJIG 12.10 (2014); *see generally Haberle v. Buchwald*, 480 N.W.2d 351, 357 (Minn. App. 1992) (civil fraud claim may be proved through circumstantial evidence), *review denied* (Minn. Aug. 4, 1992). Also, in criminal cases, where the burden of proof is higher, the Minnesota Supreme Court has held that actual knowledge may be proved through circumstantial evidence. *State v. Al-Naseer*, 734 N.W.2d 679, 688 (Minn. 2007). Thus, Ariola may rely on circumstantial evidence to prove the city's actual knowledge.

Turning to the summary-judgment analysis, we examine the circumstantial evidence of the city's actual knowledge, including: (a) past complaints the city received about pollution in Lily Lake; (b) media coverage of A.B.'s death in 2010; and (c) the county's water testing and awareness of the risk of NF in Lily Lake before Jack's death. Because we are reviewing a summary-judgment decision, we will address each category of circumstantial evidence, drawing all inferences in favor of Ariola. *Rochester City Lines*, 868 N.W.2d at 661.

### Pollution Complaints

Ariola offered evidence of pollution complaints the city received in the late 1990s and early 2000s about Lily Lake and the 2007 lake-management plan, which found that Lily Lake contained excess amounts of phosphorus and chlorophyll-a. Ariola argues that, because "it is not necessary to prove the landowner anticipated the exact nature of the

---

constructive knowledge standard when it should have applied an actual knowledge standard.

particular accident that occurred," a reasonable jury could conclude that the city's knowledge of the pollution establishes the city's knowledge of a condition likely to cause death or serious bodily harm.

The record supports Ariola's claim that the city had actual knowledge that Lily Lake was polluted, but this evidence does not satisfy the trespasser exception. Our caselaw establishes that a municipality must have actual knowledge of a condition that is *likely* to cause death or serious bodily injury. In *Johnson v. State*, this court explained that conditions that are likely to cause death or serious bodily harm under the trespasser exception "generally have inherently dangerous propensities, such as a high voltage electrical wire." 478 N.W.2d 769, 773 (Minn. App. 1991), *review denied* (Minn. Feb. 27, 1992). Ariola's theory fails because he offered no evidence that the city knew the lake's pollution was inherently dangerous, likely to cause death or serious bodily harm, or contained NF.

There is no evidence that, at any time before Jack's death, the city received complaints about the water causing death or serious bodily harm to a swimmer.[17] Three city officials and six city employees stated that, before Jack's death, they were unaware of

---

[17] Some of the pollution complaints allege that the water was not "swimmable" and that it was "dirty," but there are no allegations that the lake contained NF or that anyone had been harmed or become ill after swimming in the lake. The city notes that the absence of complaints about NF or a dangerous condition in the lake defeats Ariola's theory. We have stated that "a lack of complaints has been held to be sufficient to demonstrate lack of knowledge." *Prokop*, 754 N.W.2d at 715; *see also Stiele ex rel. Gladieux v. City of Crystal*, 646 N.W.2d 251, 255 (Minn. App. 2002) (finding that the city lacked the requisite knowledge because it "had received no previous complaints or indications" that the condition was dangerous).

30

any complaints about a dangerous condition in Lily Lake. Ariola asserts that the city employees' affidavits are "self-serving," and credibility determinations are reserved for the jury. On a summary-judgment motion, however, the court may consider all admissible evidence, including witness affidavits. Minn. R. Civ. P. 56.03. Also, witness affidavits are deemed self-serving and insufficient to create a genuine fact dispute if they contradict earlier sworn statements. *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 541 n.4 (Minn. 2001). Here, however, the city employees have not contradicted earlier sworn statements. To the contrary, the only record evidence is that city officials lacked actual knowledge of NF, or any other dangerous condition in Lily Lake, before Jack's death.

### *Media Reports of A.B.'s 2010 Death*

Ariola claims that the media coverage of A.B.'s death in 2010 creates an inference that the city "more likely than not" was aware of the risk of NF in Lily Lake before Jack's death. The record evidence does not support Ariola's claim. While the evidence establishes that the city subscribes to the *Stillwater Gazette* and *Pioneer Press*, there is no evidence that any city official or employee received, read, or discussed the newspaper articles about A.B.'s death, the cause of her death, or the link to NF in Lily Lake.

Ariola cites the city administrator's testimony agreeing that it is safe to assume that some city employees read these newspapers. Ariola also asserts that, because A.B.'s mother's testified that the media aggressively pursued her after her daughter's death, it is safe to assume that the media also contacted the city. Both pieces of evidence ask a jury to

31

speculate about the city's knowledge and therefore are not sufficient to defeat summary judgment.

We acknowledge Ariola's incredulity in response to the city's assertion that it lacked actual knowledge of A.B.'s death, given the media attention at the time. But Ariola failed to produce specific facts showing that any city official or employee learned about A.B.'s death, or, more importantly, the cause of her death, before Jack died in August 2012. Even if we begin with the inference that the city had actual knowledge of A.B.'s death, Ariola produced no evidence the city had actual knowledge that her death was caused by NF in Lily Lake or that NF was likely to injure others.

In fact, none of the news articles contained in the record stated that NF in Lily Lake caused A.B.'s death or that Lily Lake contains NF. One article specifically identified Lily Lake as one of three bodies of water in which A.B. swam before her death, but also stated that "officials don't know exactly where [A.B.] was exposed to the amoeba, [and] they say none of the potential sources poses a particular threat to other swimmers." Indeed, one media report quoted a state official as stating that "it is impossible to know" which body of water supplied the specific organism that led to A.B.'s death. Notably, all of the articles advised readers to continue to swim in lakes because infections from NF are "exceedingly rare" and posed no "increased risk to the public from any particular body of freshwater."

### *Water Testing by the County*

Ariola argues that a reasonable jury could infer that the city had actual knowledge of a dangerous condition in Lily Lake because the county and city have a close relationship, the county knew that Lily Lake tested positive for NF in 2010 and 2011, and the county

would have been expected to share this information with the city. Ariola offers no record evidence, however, that, *on this occasion*, the county shared relevant information with the city. To the contrary, the only reasonable inference that can be drawn from the evidence is that the county, MDH, and CDC investigated A.B.'s death, and the county did not share information about Lily Lake with the city.

To support an inference that the county shared information about Lily Lake with the city, Ariola relies on circumstantial evidence as follows: (a) the September 1, 2010 e-mail between county officials, which implies that "local units of government" were aware of A.B.'s death; (b) the mayor's statements at a town-hall meeting after Jack's death; (c) A.B.'s mother was never instructed to keep the cause of her daughter's death confidential; and (d) A.B.'s mother shared the information about Lily Lake with her family and friends.[18] Even when viewing this evidence in the light most favorable to Ariola, it does not create anything more than a "metaphysical doubt" that, before Jack's death, the city had actual knowledge that Lily Lake contained a condition likely to cause death or serious bodily harm.

### Other Theories for Proving Actual Knowledge

Ariola advances two additional theories for proving actual knowledge. First, relying on Minnesota caselaw that construes the "expected" damage provision in insurance

---

[18] Ariola also cites an August 8, 2012 e-mail from the county to all health care providers in the east metro, alerting them of Jack's death from PAM and reminding them of A.B.'s 2010 death from the same cause. This e-mail merely creates an inference of what the health care providers knew after Jack's death, and it provides nothing more than speculation as to what the city knew before Jack died.

policies, Ariola argues that he can prove actual knowledge through evidence of willful blindness. Ariola's position is not well-taken. Whether in civil or criminal cases, willful blindness requires proof that the defendant deliberately avoided obtaining actual knowledge. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769, 131 S. Ct. 2060, 2071 (2011) (civil); *United States v. Barnhart*, 979 F.2d 647, 651 (8th Cir. 1992) (criminal). Because Ariola did not produce any evidence of the city's deliberate efforts to avoid obtaining actual knowledge of NF in Lily Lake, caselaw involving willful blindness does not apply.

Second, Ariola asserts that inquiry or implied notice may prove actual knowledge. This court has held that "[i]mplied notice differs from constructive notice in that, [it] relates to what one can learn by reasonable inquiry. *It arises from actual notice of the circumstances*, and not from constructive notice." *Elfelt*, 756 N.W.2d at 508 n.5 (second alteration in original) (quotation omitted) (emphasis added). Moreover, "[i]mplied notice charges a person with notice of everything that he could have learned by inquiry where there is sufficient actual notice to put him on guard and excite attention." *Id.* As discussed, the evidence does not create a fact issue that the city had actual knowledge that NF in Lily Lake caused A.B.'s death, or that Lily Lake contained NF.

Indeed, even assuming that the city had actual knowledge of the media articles reporting A.B.'s death, it is speculative whether the city should have inquired about the cause of her death or the source of the NF because the articles stated that NF was extremely rare, that it was safe to swim in lakes, and that the source of NF causing A.B.'s death was unknown. Therefore, Ariola did not produce evidence of the city's actual knowledge of

circumstances from which the caselaw would impose a duty to inquire of a dangerous condition in Lily Lake.

Based on the record evidence and the reasonable inferences drawn from the evidence, we conclude that there was no genuine issue of material fact regarding the city's actual knowledge under the third element of the adult trespasser exception. The circumstantial evidence on which Ariola relied is insufficient because it created only speculation or doubt about the city's actual knowledge.

The circumstances of Jack's death and the suffering by Jack's family are heartbreaking. We also acknowledge that this opinion, in conjunction with our decision in the first appeal, has the cumulative effect of denying relief for Jack's estate. There is no question that the immunity bar has harsh consequences. *County of Washington v. City of Oak Park Heights*, 818 N.W.2d 533, 543 (Minn. 2012) (recognizing the "harsh results of governmental immunity for tort and contract liability"). Summary judgment, however, requires that the nonmoving party produce evidence with specific facts showing a genuine issue for trial. Minn. R. Civ. P. 56.05. Moreover, our precedent establishes that this evidence must do more than engender speculation. *Osborne*, 749 N.W.2d at 371. Our review of the record compels affirmance of the district court's entry of summary judgment for the city.

III. **The district court erred in taxing costs and disbursements against the trustee personally.**

This court reviews "a district court's award of costs and disbursements for an abuse of discretion." *Dukowitz v. Hannon Sec. Servs.*, 841 N.W.2d 147, 155 (Minn. 2014). "The

35

district court has discretion to determine the prevailing party and the amount of [taxable] costs and disbursements, but has no discretion to relieve the nonprevailing party of its obligation to pay those costs and disbursements." *Kalenburg v. Klein*, 847 N.W.2d 34, 42 (Minn. App. 2014). "Interpretation of a statute presents a question of law, which we review de novo." *Swenson*, 793 N.W.2d at 741. Ariola argues that the district court abused its discretion in taxing $2,528.10 in costs and disbursements against him personally because he brought this wrongful-death lawsuit as a trustee, not in his personal capacity.

"In every action in a district court, the prevailing party . . . shall be allowed reasonable disbursements paid or incurred . . . ." Minn. Stat. § 549.04, subd. 1 (2016). Additionally, "costs shall be" awarded to the defendant "[u]pon discontinuance or dismissal or when judgment is rendered in the defendant's favor on the merits." Minn. Stat. § 549.02, subd. 1 (2016). But district courts have limited discretion in awarding costs and disbursements against trustees:

> In an action prosecuted or defended by an executor, administrator, trustee of an express trust, or person expressly authorized by statute, costs and disbursements may be recovered as in an action by and against a person prosecuting or defending in the person's own right. The same shall be made chargeable only upon the estate, fund, or party represented, unless the court shall direct the same to be paid by the plaintiff or defendant personally, for mismanagement or bad faith in the action.

Minn. Stat. § 549.14.

Ariola brought this lawsuit as a duly appointed wrongful-death trustee under Minn. Stat. § 573.02. Recently, we explained that "the wrongful-death statute neither transforms the decedent's claim into the next-of-kin's claim nor permits the decedent's next-of-kin to

36

file suit against the tortfeasor in his individual capacity. Rather, the wrongful-death statute, by its express terms, permits the trustee . . . to pursue the decedent's claim against the tortfeasor." *Hanbury v. Am. Family Mut. Ins. Co.*, 865 N.W.2d 83, 87 (Minn. App. 2015), *review denied* (Minn. Aug. 25, 2015).

Thus, Ariola did not—and could not—bring this wrongful-death lawsuit in his personal capacity. As such, section 549.14 requires a finding of mismanagement or bad faith before the city's costs and disbursements may be taxed against Ariola personally. *See Minneapolis St. Ry. v. Rosenbloom*, 208 Minn. 187, 189–90, 293 N.W.2d 256, 256–57 (1940) ("[Section 549.14] simply authorizes the court in which the representative appears as a party to award costs and disbursements against him personally for his misbehavior in bringing or managing the action.").

The city argues that Ariola is a "party represented" against whom costs and disbursements may be charged because he is Jack's next of kin. But, as the trustee in this wrongful-death lawsuit, Ariola is a fiduciary of Jack's next of kin. *Kolles*, 418 N.W.2d at 738. Thus, Ariola appears in this lawsuit in a representative, not a personal, capacity. Accordingly, only Jack's estate may be taxed the costs and disbursements. We reverse the district court's award of costs and disbursements and remand for further proceedings consistent with this opinion.

## DECISION

Because the statutory requirement that a wrongful-death trustee file an oath before commencing duties is not jurisdictional, the district court erred in dismissing Ariola's claims for lack of subject-matter jurisdiction. We nonetheless affirm the dismissal of the

complaint on the basis of statutory recreational-use immunity because there was no genuine issue of material fact that the city had actual knowledge of an artificial condition likely to cause death or serious bodily harm under the adult trespasser exception in the Restatement (Second) of Torts § 335. Because a wrongful-death trustee cannot be held personally liable for costs and disbursements without a finding of mismanagement or bad faith under Minn. Stat. § 549.14, the district court abused its discretion in taxing costs and disbursements against Ariola personally and we remand to the district court.

**Affirmed in part, reversed in part, and remanded.**