**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0483**

Dennis J. Daulton,
trustee for the next of kin of Brady Joel Daulton, deceased,
Appellant,

vs.

TMS Treatment Center, Inc.,
d/b/a Carlson Drake House,
Respondent.

**Filed January 16, 2024**
**Affirmed in part, reversed in part, and remanded**
**Connolly, Judge**

Hennepin County District Court
File No. 27-CV-22-12180

Jerome M. Reinan, Law Offices of J.M. Reinan, Denver, Colorado (for appellant)

Christopher L. Goodman, Thompson, Coe, Cousins & Irons, L.L.P., St. Paul, Minnesota
(for respondent)

Considered and decided by Reyes, Presiding Judge; Connolly, Judge; and Klaphake,

Judge.*

**SYLLABUS**

Minn. Stat. § 573.02, subd. 1 (2022), does not require dismissal of a wrongful-death

action based on medical malpractice when the expert-review affidavit is served after the

wrongful-death statute of limitations has expired, so long as it was served within the 60-

day safe-harbor period provided for in Minn. Stat. § 145.682, subd. 6(a) (2022).

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to
Minn. Const. art. VI, § 10.

1

**OPINION**

**CONNOLLY**, Judge

Appellant challenges the dismissal of his wrongful-death action against respondent, based on his alleged failure to timely serve an expert-review affidavit under Minn. Stat. § 145.682, subd. 2 (2022). Appellant argues that the district court abused its discretion by dismissing his complaint for two reasons: (1) Minn. Stat. § 145.682 (2022) does not apply to his claim because he did not allege medical malpractice for which expert testimony is necessary to prove a prima facie case; and (2) in the alternative, appellant's expert-review affidavit was timely served within the 60-day safe-harbor period under Minn. Stat. § 145.682, subd. 6(a). We conclude that the district court did not abuse its discretion by determining that Minn. Stat. § 145.682 applies to appellant's medical-malpractice claim. But because we determine that the district court abused its discretion by dismissing appellant's claim for failure to serve the expert-review affidavit within the statute-of-limitations period, we affirm in part, reverse in part, and remand.

**FACTS**

Appellant Dennis J. Daulton is the trustee for the next of kin of his deceased son, Brady Daulton. Brady suffered from schizoaffective disorder, suicidal ideation, and related substance-abuse and addiction problems. In April 2019, Brady was hospitalized due to his mental illness, classified as a "vulnerable adult," and civilly committed because he was declared "a danger to himself and/or gravely ill." *See* Minn. Stat. § 626.5572, subd. 21 (2022) (defining "vulnerable adult"). In August 2019, Brady was transferred to the care of

2

respondent TMS Treatment Center,[1] an intensive supervisory residential treatment service provider (IRTS), for monitoring and mental-health treatment.

Respondent created two treatment plans for Brady: (1) a program abuse protection plan (PAPP); and (2) an individual abuse prevention plan (IAPP). *See* Minn. Stat. § 245A.65, subd. 2 (2022) (requiring license holders serving vulnerable adults to establish and enforce written abuse prevention plans on a program and individual level). The PAPP required respondent to monitor its clients, including Brady, by implementing a "combination of security cameras, WanderGuard, and staff rounds to minimize the risk of abuse from occurring."[2] The PAPP also included a missing person policy that required staff to file a report if a client did not return when expected. Similarly, Brady's IAPP required respondent to "monitor [Brady] for increased mental health symptoms and contact [the] on-call mental health professional as indicated," as well as "monitor [Brady] for alcohol and substance use." On August 19 and 22, 2019, after Brady suffered a non-fatal overdose on Benadryl, his IAPP was revised to increase substance-abuse monitoring by a night mental-health worker between the hours of 12:00 a.m. and 3:00 a.m.

On August 22, 2019, Brady did not return from his morning psychiatry appointment. Although no missing-person report was filed, Brady was later declared absent without leave (AWOL). On August 23, 2019, at approximately 1:00 a.m., Brady was found at a nearby convenience store. Unbeknownst to respondent, Brady had purchased

---

[1] Respondent conducts business under the name Carlson Drake House.
[2] WanderGuard is an electronic tracking device worn by respondent's clients that "sense[s] whether a resident [is] present at the facility."

methamphetamine from a drug dealer while off-site. One of respondent's employees returned Brady to the facility, expressing no concerns that Brady was under the influence of drugs or alcohol. Brady was "monitored through the night." On August 24, 2019, at 1:30 p.m., Brady was found deceased in his room due to an overdose of methamphetamine.

Bloomington police investigated Brady's death. Officers interviewed respondent's employees who had been working the night of Brady's absence, including D.B. and A.M. D.B. told police that she had checked on Brady at approximately 11:30 p.m. the night before his death and had observed him sleeping. A.M. stated that, although he was supposed to conduct hourly checks on all clients, he had only verified that Brady was in his room once, on the morning of August 24, 2019, at 10:00 a.m.

Officers referred Brady's case to the Minnesota Department of Human Services (the department) because of suspected maltreatment. *See* Minn. Stat. § 626.557 (2022) (providing for the protection of vulnerable adults subject to maltreatment). The department concluded that "there was not a preponderance of the evidence [that] there was a failure to provide care and or service for" Brady, and that respondent had largely followed "the minimal requirements of facility policies, procedures, and relevant statutes." The department did not determine whether neglect occurred. But it did conclude that respondent committed two violations of Minn. Stat. § 245A.65, subd. 2, by failing to (1) use WanderGuard as directed by the PAPP; and (2) revise Brady's IAPP with specific measures to monitor for increased mental-health symptoms.

On August 23, 2022, appellant served respondent with a wrongful-death action, alleging that respondent's "act[s] and omissions resulted in Brady's death." On

4

September 14, 2022, respondent moved to dismiss[3] the action with prejudice because appellant had not served an expert-review affidavit with the summons and complaint within the three-year statute of limitations. *See* Minn. Stat. §§ 145.682, subd. 2 (requiring an expert-review affidavit for medical-malpractice claims); 573.02, subd. 1 (providing a three-year statute of limitations for wrongful-death actions). On October 27, 2022, appellant served respondent with the requisite affidavit, claiming that respondent's motion constituted a 60-day demand. *See* Minn. Stat. § 145.682, subd. 6(a) (allowing 60 days from a party's demand to properly serve an expert-review affidavit under Minn. Stat. § 145.682, subd. 2(1)).

The district court held a hearing, issued a decision granting respondent's motion, and dismissed appellant's complaint with prejudice. In its order, the district court found that respondent was a health care provider and that expert testimony was necessary. It also determined that appellant's failure to serve an expert-review affidavit before expiration of the three-year statute of limitations resulted in defective process, requiring dismissal for lack of subject-matter jurisdiction. The district court rejected appellant's argument that he was entitled to serve the expert-review affidavit within the 60-day safe-harbor period under Minn. Stat. § 145.682, subd. 6(a). The district court reasoned that "no other court has held that the safe harbor provision mandates the court allow plaintiff to cure their process within 60 days if dismissed under another rule or statute."

---

[3] Respondent's motion was brought under Minn. R. Civ. P. 12.02(a) (lack of subject-matter jurisdiction), 12.02(b) (lack of personal jurisdiction), 12.02(c) (insufficiency of process), 12.02(d) (insufficiency of service of process), and 12.02(e) (failure to state a claim upon which relief can be granted).

5

This appeal follows.

## ISSUES

**I.** Did the district court abuse its discretion by determining that the requirements under Minn. Stat. § 145.682 applied to appellant's wrongful-death action?

**II.** Did the district court abuse its discretion by dismissing appellant's claim for failure to serve the expert-review affidavit within the three-year statute of limitations for a wrongful-death action?

## ANALYSIS

To pursue a wrongful-death claim, the plaintiff must (1) appoint a trustee to bring the action on behalf of the decedent's next of kin, and (2) commence the action within three years of the date of the decedent's death. *See* Minn. Stat. § 573.02, subds. 1, 3 (2022). If the action is based on medical malpractice, the plaintiff must establish a prima facie case showing: "(1) the standard of care recognized by the medical community as applicable to the . . . defendant's conduct; (2) that the defendant departed from that standard; (3) that the defendant's departure . . . was a direct cause of the [plaintiff's] injuries; and (4) damages." *Tousignant v. St. Louis County*, 615 N.W.2d 53, 59 (Minn. 2000) (quotation omitted). A prima facie case offers evidence that, when taken as true, is sufficient to show the facts alleged in the complaint. *Id.*

When expert testimony is necessary, the plaintiff must first serve on the defendant, with the summons and complaint, an affidavit drafted by the plaintiff's attorney stating that the affiant has reviewed the facts of the case "with an expert whose qualifications provide a reasonable expectation that the expert's opinions could be admissible at trial and that, in the opinion of this expert, one or more defendants deviated from the applicable standard of

6

care and by that action caused injury to the plaintiff." Minn. Stat. § 145.682, subds. 2, 3(1). Failure to comply within 60 days of an opponent's demand for the affidavit results in mandatory dismissal with prejudice of any claim as to which expert testimony is necessary to make a prima facie case. *Id.*, subd. 6(a).

Appellant challenges the district court's order dismissing his complaint for failure to serve an expert-review affidavit, alleging that (1) he was not required to serve an expert-review affidavit because Minn. Stat. § 145.682, does not apply to his case; and (2) in the alternative, he properly served the expert-review affidavit within the timeline set forth in Minn. Stat. § 145.682, subd. 6(a). We address each argument in turn.

## I. The district court did not abuse its discretion by determining that the requirements under Minn. Stat. § 145.682 applied to appellant's wrongful-death action.

Minnesota law generally requires expert testimony in medical-malpractice cases because they often "involve complex issues of science or technology, requiring expert testimony to assist the jury in determining liability." *Tousignant*, 615 N.W.2d at 58. We review a district court's dismissal of a claim under Minn. Stat. § 145.682 for an abuse of discretion. *Maudsley v. Pederson*, 676 N.W.2d. 8, 11 (Minn. App. 2004). "A district court abuses its discretion by making findings of fact that are unsupported by the evidence, misapplying the law, or delivering a decision that is against logic and the facts on record." *Bender v. Bernhard*, 971 N.W.2d 257, 262 (Minn. 2022) (quotation omitted). Whether section 145.682 applies here is an issue of statutory interpretation, which we review de novo. *See Ramirez v. Ramirez*, 630 N.W.2d 463, 465 (Minn. App. 2001).

Appellant asserts that Minn. Stat. § 145.682 does not apply to his claim because (A) respondent was not a "health care provider" entitled to protection under the statute; (B) the employee whose actions were alleged to have caused the harm was not a licensed health-care professional; (C) this is a case of ordinary negligence not medical malpractice; and (D) a jury hearing the evidence would not require expert testimony to decide the issues of standard of care, breach, and causation. For the following four reasons, we disagree.

## A.      Respondent is a health care provider.

The expert-review-affidavit requirements under Minn. Stat. § 145.682 apply to claims against a "health care provider," which is defined as "a physician, surgeon, dentist, or other health care professional or hospital, including all persons or entities providing health care as defined in section 145.61, subdivisions 2 and 4." Minn. Stat. § 145.682, subd. 1. "Health care" is defined as "professional services rendered by a professional or an employee of a professional and services furnished by a hospital, sanitarium, nursing home or *other institution* for the hospitalization or care of human beings." Minn. Stat. § 145.61, subd. 4 (2022) (emphasis added). The supreme court has held that "other institutions" must share common characteristics with the institutions enumerated under the statute. *Kaiser v. Mem'l Blood Ctr. of Minneapolis, Inc.*, 486 N.W.2d 762, 766 (Minn. 1992) (explaining that bloods banks were not like the enumerated institutions because they were not "primarily in-patient, comprehensive health care facilities").

Appellant contends that Minn. Stat. § 145.682 does not apply because respondent is not a "health care provider." We disagree. Appellant's complaint alleged that respondent is "an intensive residential treatment service provider" that offers "an alternative to

8

hospitalization" to those "with a primary diagnosis of mental illness." The complaint also alleged that respondent provides various services: individualized assessment; illness management; integrated services for mental illness and chemical dependency; family education; crisis assistance; development of healthcare directives and crisis prevention plans; nursing services; inter-agency case coordination; various therapy options; housing first; and client transition and discharge planning.

Appellant also alleged that Brady was transferred to respondent's care "[b]ased on assurances made by [respondent] about its ability to keep Brady safe in the context of his suicidal ideations." Respondent's treatment plan for Brady included 24-hour supervision to monitor "for changes in mental health status, including cognition, mood, communications, and behavior," as well as "for delusions, paranoia, agitation, aggressive behavior, disorganization, grandiosity, and sleep disturbance"; chemical assessments using "breathalyzers, room searches, and [urinary analysis]"; and the use of WanderGuard to monitor for elopement.

In sum, appellant's complaint indicates that Minn. Stat. § 145.682 applies. As the district court determined, appellant has not made a persuasive argument that respondent is not an "institution" that provided "health care" to Brady. Therefore, we agree with the district court that respondent is a "health care provider" under Minn. Stat. § 145.682, subd. 1.

**B.      Respondent provides services under a professional licensure.**

Appellant asserts that expert testimony is not required because A.M., the employee charged with monitoring Brady during the time he absconded, was not an individually

licensed medical professional.  But the statute does not require that individual health care providers be licensed to fall within its scope.  A "health care provider" includes "all persons or entities providing health care" and "'[h]ealth care' means professional services rendered by a professional or an *employee* of a professional."  Minn. Stat. §§ 145.682, subd. 1; .61, subd. 4 (emphasis added).

Here, respondent is licensed in Minnesota to provide residential crisis stabilization. And A.M. is an employee under the supervision of Terry Schneider, a licensed psychologist acting as the President, Chief Executive Officer and Director of Clinical Services for respondent.  *Kaiser*, 486 N.W.2d at 766 n.5 (recognizing psychologists as "health care professionals").  Therefore, A.M.'s actions fall within the statute's scope.  *See* Minn. Stat. § 145.682, subd. 1.

### C.    Appellant brought an action for medical malpractice.

Appellant also contends that this is an ordinary negligence case and that the statute does not apply because following the instructions in the PAPP and IAPP amounts to administrative or ministerial conduct; it is not the sort of conduct that requires a professional license.  *See Kaiser*, 486 N.W.2d at 767 (distinguishing "between malpractice by professionals acting pursuant to their professional licensure from negligence based upon conduct for which a professional license is not required").

We agree with appellant that a medical-malpractice action "typically involve[s] negligent conduct that is connected to a person's professional licensure." *Paulos v. Johnson*, 597 N.W.2d 316, 320 (Minn. App. 1999), *rev. denied* (Minn. Sept. 28, 1999).  In *Kaiser*, the supreme court concluded that allegations against blood-bank physicians for

10

negligent blood-donor selection and blood screening, and failure to warn the public of the risks of blood transfusions, were based on common-law negligence. 486 N.W.2d at 767-68. The supreme court explained that the allegations did not involve medical malpractice because the physicians' actions related to their administrative duties, rather than their professional licensure. *Id.*; *see Blatz v. Allina Health Sys.*, 622 N.W.2d 376, 385 (Minn. App. 2001) (concluding that paramedics' use of an address to locate a home when responding to an emergency did not implicate professional judgment and was ordinary negligence), *rev. denied* (Minn. May 16, 2001).

However, in *Henderson v. Allina Health System*, we held that hospital employees' failure to raise a patient's bed rails was not ordinary negligence because the employees' actions required professional judgment. 609 N.W.2d 7, 10 (Minn. App. 2000), *rev. denied* (Minn. June 13, 2000). We reasoned that, because the employees were acting pursuant to the hospital's written policy that employees must raise a patient's bed rails "as necessary . . . based on [a] patient's status," their actions required an understanding of the patient's medical needs, constituting professional judgment. *Id.* at 9.

The district court here determined that respondent's alleged conduct, including "failing to adequately plan treatment, provide sufficiently trained staff, and reasonably update the treatment plan, among other acts and omissions," were more than simple ministerial or administrative acts; they required some professional judgment and flowed from a therapeutic relationship with Brady. We agree with the district court's assessment.

Although it could be argued that respondent's failure to fit Brady with a WanderGuard device and carry out hourly checks on Brady were ministerial functions, and

11

did not involve the use of professional judgment, we note that appellant's complaint alleges that respondent failed to comply with internal plans and procedures, including "conduct[ing] irregular checks to confirm the presence and condition of residents judged to be at risk for AWOL" so that "appropriate" actions could be taken. And the AWOL procedure allowed employees discretion in reporting missing persons, as there was "no minimum amount of time that need[ed] to expire before a report [was] made." Employees were instructed to exercise professional judgment when "us[ing] all reasonable means to assess its residents" and "provide reasonable and appropriate supervision" by performing "irregular checks to confirm the presence and condition of [its] residents." Similar to *Henderson*, these tasks require an understanding of a client's medical needs and status, and therefore, involve professional judgment. 609 N.W.2d at 10; *see also Kanter v. Metro Med. Ctr.*, 384 N.W.2d 914, 915-16 (Minn. App. 1986) (concluding that an employee's decision to leave a psychiatric patient unsupervised in the bathtub for a few minutes required professional judgment), *rev. denied* (Minn. Apr. 15, 1986).

In sum, the allegations in the complaint support the district court's determination that Brady's death was connected to respondent's professional services as a licensed IRTS provider and flowed from the therapeutic relationship between them. *Paulos*, 597 N.W.2d at 320 (explaining medical malpractice actions "flow[] from a therapeutic relationship" between patient and provider). Expert testimony is therefore required.

12

**D. Expert testimony is necessary here to show a prima facie case of medical malpractice.**

Finally, appellant asserts that expert testimony is unnecessary to show a prima facie case. He argues that lay jurors do not need the aid of an expert to understand his allegations that Brady's absence from the treatment center and overdose from drugs was only possible because he was not supervised as outlined in the PAPP and IAPP. We disagree.

If lay jurors can understand all elements of the claim, including the standard of care, breach of that standard, and causation, without expert testimony, then expert testimony is unnecessary. *See Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188, 191 (Minn. 1990). These situations, however, are rare. *Id.* Generally, when expert testimony is unnecessary, it is because breach and causation are undisputed and are "a matter of common knowledge and experience." *See Tousignant*, 615 N.W.2d at 60.

Contrary to appellant's assertions, this case is distinguishable from *Tousignant*. In that case, a confused, elderly woman recovering from a broken hip in the hospital was not restrained or supervised as outlined in her treatment plan. *Id.* at 56. She later fell from her wheelchair and refractured her hip. *Id.* at 60. The Minnesota Supreme Court concluded that this was one of the rare cases that did not require expert testimony because lay people could understand that if an elderly person is confused, unrestrained, and recovering from a broken hip, she could fall and be reinjured. *Id*.

Appellant's allegations are not so straightforward. The interplay between appellant's allegations that respondent failed to plan Brady's treatment; monitor and supervise his care; update his treatment plan; and follow the rules, regulations, and statutes

applicable to IRTS providers is beyond the understanding of lay jurors. *See Kanter*, 384 N.W.2d at 916 (reasoning that "the potential tendencies of patients suffering from mental illness are not so easily determined by one without special training and knowledge").

And unlike in *Tousignant*, causation is disputed, as it is unclear whether respondent's alleged inadequate supervision, outdated treatment plan, or failure to follow its internal protocols and policies led to Brady eloping, and later purchasing, ingesting, and overdosing on methamphetamine. Because this case falls outside the narrow exception, the district court did not err by determining that the issues here require expert testimony.

In sum, the district court did not abuse its discretion in determining that appellant's claim was subject to the requirements of Minn. Stat. § 145.682 because he alleged medical malpractice for which expert testimony was necessary to show the standard of care, breach, and causation.[4]

---

[4] Appellant also argues that respondent was negligent per se based on its "fail[ure] to follow rules, regulations, and statutes governing the operation of IRTS." *See* Minn. Stat. § 245A.65, subd. 2 (requiring license holders serving vulnerable adults to "establish and enforce ongoing written program abuse prevention plans"). Appellant's argument fails for two reasons. First, as the district court acknowledged, appellant failed to assert violations of the statute in his complaint. *Roberge v. Cambridge Co-op. Creamery Co.*, 67 N.W.2d 400, 403 (Minn. 1954) (recognizing rule that parties are "bound by the pleadings unless the other issues are litigated by consent"). Second, even if appellant had properly pleaded negligence per se, it only proves duty and breach, and an evidentiary basis is still required for causation, which appellant has not persuaded us can be done here without the aid of expert testimony. *See Staub v. Myrtle Lake Resort, LLC*, 964 N.W.2d 613, 624 n.10 (Minn. 2021).

**II.** **The district court abused its discretion by dismissing appellant's claim for failure to serve the expert-review affidavit within the three-year statute of limitations for a wrongful-death action.**

A wrongful-death action is a statutorily created cause of action, making compliance with the requirements under Minn. Stat. § 573.02, subd. 1, within the specified three-year statute of limitations a "condition precedent to the right to maintain the action." *Berghuis v. Korthuis*, 37 N.W.2d 809, 810 (Minn. 1949); *see Ortiz v. Gavenda*, 590 N.W.2d 119, 121 (Minn. 1999) (explaining that a wrongful-death action is "purely statutory"). Therefore, respondent's reliance on the statute of limitations as a defense to appellant's wrongful-death claim implicates the district court's subject-matter jurisdiction, which we review de novo. *Ariola v. City of Stillwater*, 889 N.W.2d 340, 348 (Minn. App. 2017), *rev. denied* (Minn. Apr. 18, 2017).

Appellant argues that the district court erred by determining that appellant's (1) failure to satisfy the expert-review-affidavit requirement within the three-year limitations period for commencing a wrongful-death action deprived the district court of subject-matter jurisdiction; and (2) service of the expert-review affidavit within the 60-day safe-harbor period did not cure the alleged defective process. We agree with appellant.

Minnesota's wrongful-death statute provides a three-year statute of limitations:

> When death is caused by the wrongful act or omission of any person or corporation, the trustee appointed as provided in subdivision 3 may maintain an action therefor if the decedent might have maintained an action, had the decedent lived, for an injury caused by the wrongful act or omission. An action to recover damages for a death caused by the alleged professional negligence of a physician, surgeon, dentist, hospital or sanitarium, or an employee of a physician, surgeon, dentist, hospital or sanitarium *shall be commenced within three years*

15

*of the date of death*, but in no event shall be commenced beyond the time set forth in section 541.076.

Minn. Stat. § 573.02, subd. 1 (emphasis added).

An action alleging medical malpractice requires service of an expert-review affidavit with the summons and complaint:

> In an action alleging malpractice, error, mistake, or failure to cure, whether based on contract or tort, against a health care provider which includes a cause of action as to which expert testimony is necessary to establish a prima facie case, the plaintiff must: (1) unless otherwise provided in subdivision 3, clause (2), *serve upon defendant with the summons and complaint an affidavit as provided in subdivision 3*; and (2) serve upon defendant within 180 days after commencement of discovery under the Rules of Civil Procedure, rule 26.04(a) an affidavit as provided by subdivision 4.

Minn. Stat. § 145.682, subd. 2 (emphasis added). Failure to serve the expert-review affidavit results in mandatory dismissal with prejudice when (1) a demand for the affidavit is made; and (2) the plaintiff fails to serve an expert-review affidavit within 60 days of the demand. Minn. Stat. § 145.682, subd. 6(a); *Paulos*, 502 N.W.2d at 399 ("[A] 60[-]day demand is a prerequisite for dismissal under subd[ivision] 6."). But the wrongful-death statute is silent on whether this service is a jurisdictional requirement to commencing an action. *See* Minn. Stat. § 145.682, subd. 2.

Appellant argues that the district court erred by determining that the expert-review-affidavit requirement, under Minn. Stat. § 145.682, subd. 2, is a jurisdictional requirement, and by concluding that appellant's failure to comply within the three-year statute-of-limitations period deprived the district court of subject-matter jurisdiction. *See Podvin v.*

16

*Jamar Co.*, 655 N.W.2d 645, 648 (Minn. App. 2003) ("Sufficiency of process is a jurisdictional question.").

To determine whether service of the expert-review affidavit is jurisdictional, an issue of first impression in Minnesota, we must look first to the plain language of the statute, followed by the statutory framework and purpose. Minn. Stat. § 645.16 (2022); *Goodman v. Best Buy, Inc.*, 777 N.W.2d 755, 758 (Minn. 2010) ("In reading the statute, it is necessary to consider not only the bare meaning of the word or phrase, but also its placement and purpose in the statutory scheme." (quotation omitted)); *Burkstrand v. Burkstrand*, 632 N.W.2d 206, 210 (Minn. 2001) (explaining that when statutory language is silent, courts consider other factors to interpret its meaning, including the statute's purpose). We must also read a statute as a whole, giving "effect to all of [the statute's] provisions; no word, phrase, or sentence should be deemed superfluous, void, or insignificant." *Am. Fam. Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000) (quotation omitted).

The plain language of Minn. Stat. § 573.02, subd. 1, requires that the plaintiff commence a wrongful-death action "within three years of the date of [the decedent's] death" and that an appointed trustee maintain the action for the next-of-kin of the decedent. Minn. Stat. § 573.02, subds. 1, 3; *see Kolles v. Ross*, 418 N.W.2d 733, 738 (Minn. App. 1988) (stating that "it is the trustee who has the exclusive right to maintain" a wrongful death action), *rev. denied* (Minn. Mar. 30, 1988). There is nothing in subdivision 1 that indicates an expert-review affidavit must be served within the three-year statute-of-

limitations period to commence a wrongful-death action based on medical malpractice. *See* Minn. Stat. § 573.02, subd. 1.

Similarly, the plain language of Minn. Stat. § 145.682, subd. 2, does not state that the expert-review affidavit must be served before the applicable statute of limitations expires when bringing a claim under Minn. Stat. § 573.02, subd. 1. Instead, it affords plaintiffs enumerated exceptions to serving the expert-review affidavit with the summons and complaint. Minn. Stat. § 145.682, subd. 3(2) (providing that the plaintiff, who could not reasonably obtain the expert-review affidavit before the expiration of the statute-of-limitations period, may submit an affidavit stating the same and serve the expert-review affidavit within 90 days from the date of the service of the summons and complaint), subd. 6(a) (providing a 60-day safe harbor following demand for the affidavit).

In *Ariola*, we held that the wrongful-death statute's requirement that a trustee file a consent and oath was not jurisdictional because it was placed in a different subdivision than the statute-of-limitations provision. 889 N.W.2d at 351-52 (interpreting Minn. Stat. § 573.02, subd. 3). We concluded that the oath requirement's placement "suggest[ed] that it [was] *not* a condition precedent to filing a timely wrongful-death lawsuit." *Id.* at 351 (emphasis added). And we explained that "[i]f the legislature had intended to link the oath requirement with the limitations provision, it could have" by placing them in the same subdivision. *Id.* at 351-52.

The circumstances here are like those in *Ariola*. But here, not only is the expert-review-affidavit requirement absent from section Minn. Stat. § 573.02, subd. 1—where the statute of limitations is set forth—it is absent from the statute entirely. Accordingly, the

18

legislature's omission suggests that serving the expert-review affidavit is not a condition precedent to commencing a wrongful-death action. *See Parker v. O'Phelan*, 414 N.W.2d 534, 538 (Minn. App. 1987) (rejecting the argument that Minn. Stat. § 145.682 operates as a jurisdictional condition because "the statute lacks the characteristics of the typical statute of limitations which is designed by the legislature to limit periods within which actions may be *initiated*" (emphasis added)), *aff'd*, 428 N.W.2d 361 (Minn. 1988).

Respondent argues that *Ortiz* supports its contention that failure to satisfy the expert-review-affidavit requirements is a jurisdictional issue, not a procedural one. But *Ortiz* does not discuss the expert-review-affidavit requirement. 590 N.W.2d at 122-23. Instead, *Ortiz* makes clear that appointment of a trustee is a jurisdictional prerequisite to bringing a wrongful-death action. *Id.* at 122-23; *see also* Minn. Stat. § 573.02, subds. 1, 3 (stating a trustee must be appointed to "commence or continue" a wrongful-death action). This happened here when appellant was appointed as trustee for Brady's next-of-kin. Nothing in *Ortiz* suggests that this principle extends to the expert-review-affidavit requirement found in a separate statute.

Similarly, we agree with appellant that *Broehm v. Mayo Clinic Rochester*, 690 N.W.2d 721, 728 (Minn. 2005), does not help us determine whether service of an expert-review affidavit is required to *commence* an action. In that case, the facts pertained to the expert-disclosure affidavit required by Minn. Stat. § 145.682. *Broehm*, 690 N.W.2d at 724-25; *see also* Minn. Stat. § 145.682, subd. 2(2) (establishing the requirement that the plaintiff must "serve upon defendant within 180 days after commencement of discovery . . . an affidavit as provided by subdivision 4"). Because the expert-disclosure

affidavit is not due until discovery is underway, it is not instructive on whether the expert-review affidavit is needed to *commence* the action. *See* Minn. Stat. § 145.682, subds. 2(2), 4(a).

Our interpretation of the plain language of the statutes, statutory scheme, and caselaw is consistent with the purpose for requiring that parties strictly adhere to the requirements under both the expert-review-affidavit statute and the wrongful-death statute. *See In re Schmalz*, 945 N.W.2d 46, 50 (Minn. 2020) ("In reading the statute, it is necessary to consider not only the bare meaning of the word or phrase, but also its placement and purpose in the statutory scheme." (quotation omitted)).

The Minnesota legislature enacted the expert-review and expert-disclosure requirements to readily identify and dismiss "frivolous" cases. *Sorenson*, 457 N.W.2d at 191. To fulfill this purpose, parties must "strictly adhere" to the statutory requirements and avoid undermining the legislature's procedural reforms in professional malpractice actions. *Broehm*, 690 N.W.2d at 726. As appellant notes, the legislature amended the expert-review-affidavit statute to include the 60-day safe-harbor period wherein plaintiffs may serve an expert-review affidavit even when they had failed to do so when serving the summons and complaint. 2002 Minn. Laws. ch. 403, § 1, at 1706-07. Allowing appellant's claim to be dismissed for failure to serve the expert-review affidavit before respondent demanded its production would fail to strictly adhere to the requirements that a demand be made and appellant be allotted 60 days to comply before the district court may dismiss the action on this ground. Minn. Stat. § 145.682, subd. 6(a); *Paulos*, 502 N.W.2d at 399 ("[A] 60[-]day demand is a prerequisite for dismissal under subd[ivision] 6.").

Under section 145.682, subdivisions 2(1) and 6(a), an expert-review affidavit must be served with the summons and complaint, or within 60 days of demand for the same. Minn. Stat. § 145.682, subds. 2(1), 6(a). This is not a jurisdictional requirement to commencing a wrongful-death action that confers subject-matter jurisdiction on the district court. Instead, it is a mechanism for dismissing meritless lawsuits early on in the litigation. *Sorenson*, 457 N.W.2d at 191. Any other interpretation would require us to add words to Minn. Stat. § 145.682, subd. 2(1): that when bringing a wrongful-death action based on medical malpractice, the plaintiff must serve the expert-review affidavit before the three-year-limitations period expires. *See Rohmiller v. Hart*, 811 N.W.2d 585, 590 (Minn. 2012) ("We cannot add words or meaning to a statute that were intentionally or inadvertently omitted.").

This was the case here, as respondent did not move to dismiss—which appellant treated as a demand—until after the limitations period expired. Because the 60-day safe-harbor period begins to run only after a demand for the affidavit is made, respondent's interpretation would allow a defendant to wait until the statute of limitations expires before making a demand, moving for dismissal, and thereby depriving appellant of the statutory right to cure. *See* Minn. Stat. § 145.682, subd. 6(a); *see also Paulos*, 502 N.W.2d at 399 (stating that "[i]f no affidavit is furnished with the complaint, the demand constitutes actual notification to the plaintiff of the statutory requirement," and "[t]he law then allows another 60 days to comply"). We refuse to adopt respondent's interpretation, as doing so would frustrate the legislature's intent in affording plaintiffs 60 days after demand to serve an expert-review affidavit. *See* Minn. Stat. § 145.682, subd. 6(a).

21

Because serving the expert-review affidavit is not a prerequisite to filing a wrongful-death action, appellant had 60 days from the date respondent moved to dismiss, which appellant treated as a demand, to serve the affidavit on respondent. *See* Minn. Stat. § 145.682, subd. 6(a). Appellant undisputedly did so. Thus, appellant's claim was not subject to mandatory dismissal. *See id.*

**DECISION**

Appellant alleged a wrongful-death action based on medical malpractice subject to the expert-review requirements under Minn. Stat. § 145.682, subd. 2. Because Minn. Stat. § 573.02, subd. 1, does not require that an expert-review affidavit under Minn. Stat. § 145.682, subd. 2, be served before the expiration of the three-year-limitations period, and because appellant properly filed and served an expert-review affidavit within the 60-day safe-harbor period provided under Minn. Stat. § 145.682, subd. 6(a), the district court abused its discretion by dismissing appellant's claim.

**Affirmed in part, reversed in part, and remanded.**